UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,

                                        No. 11 CR 340 (ERK)

      -against-

MOUSA KHOULI, *et al.,*

          *Defendants,*

SALEM ALSHDAIFAT,

          *Defendant-Movant.*

-------------------------------------------------------- X


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SALEM ALSHDAIFAT'S MOTION FOR A CHANGE OF VENUE


By:    Henry E. Mazurek
CLAYMAN & ROSENBERG LLP
305 Madison Avenue, Suite 1301
New York, New York 10165
(212) 922-1080 (Tel.)
(212) 949-8255 (Fax)
mazurek@clayro.com

*Attorneys for SALEM ALSHDAIFAT*

# TABLE OF CONTENTS

**Page**

INTRODUCTION……………………………………………...1

FACTUAL BACKGROUND…………………………………..6

    A)  The Indictment and its Nexus to the Eastern District of New York…….. ..8

    B)  Salem Alshdaifat's Substantial Connection to the Eastern District of
    Michigan and the Extreme Hardship of Defending This Case in
    Brooklyn Federal Court.....……………………………………..10

        1.  Choice of Counsel……………………………....11

        2.  Financial and Family Burdens Exacerbated by Charges in Distant
        Court………………………………….………...............11

        3.  Mr. Alshdaifat's Physical Health is Best Served by Trial
        Close to Home……………………………….…. .…..15

    C)  Location of Government and Defense Witnesses………………16

ARGUMENT……………………………………………….19

    A)  Legal Standard…… ..…………………………….…..19

    B)  In Mr. Alshdaifat's Case, the *Platt* Factors and the Historical
    Constitutional Principle of Avoiding Undue Hardship to Criminal
    Defendants Because of the Government's Choice of Venue Weigh
    in Favor of Transfer to the Eastern District of Michigan…….…...……..21

        1.  Mr. Alshdaifat Residence and Family Obligations Strongly
        Merit a Change of Venue...…………………………..22

        2.  Mr. Alshdaifat's Witnesses Reside and Work in the Detroit
        Metropolitan Area and Government Agent Witnesses Are
        Also Stationed in Detroit……………………… .…25

        3.  The Events in This Case Are Not Centralized in a Single
        Location and the Location of Documents is of Little
        Consequence Because of Electronic Case Management…… ...…..31

## TABLE OF CONTENTS (cont'd)

**Page**

4. Mr. Alshdaifat's Business Has Been Severely Disrupted
   by His Arrest and Indictment, and His Wife's Job, Which
   Has Become the Only Stable Source of Family Income,
   Will be Jeopardized if this Case Continues to be Adjudicated
   In Brooklyn . . . . . . . . . . . . . . . . . . . ..  . 33

5. On Balance, the Cost Impact on Mr. Alshdaifat of Trying
   This Case in Brooklyn Outweighs the Marginal Costs
   to the Government of a Potential Second Trial in Detroit ... .  .  .36

6. None of the Remaining *Platt* Factors Weigh Against Transfer
   to the Eastern District of Michigan and, to the Extent Relevant, They
   Slightly Favor Transfer . . . . . . . . . . . . . . . ..  .  ..43

7. "Special Elements" Weigh In Favor of Transfer to Michigan .  .  .  45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . ..46

## **TABLE OF AUTHORITIES**

### **Cases**

**Page**

*Hyde v. Shine*, 199 U.S. 62 (1905)……………………………………...19

*Matter of Balsimo*, 68 F.3d 185 (7th Cir. 1995)...................................................21

*Platt v. Minnesota Mining & Mfg. Co.,* 376 U.S. 340 (1964) ………...*passim*

*United States v. Alshdaifat*, No. 11-30365 (E.D. Mi. July 14-15, 2011) ………..43

*United States v. Amador Casanas*, 233 F.Supp. 1001 (D.D.C. 1964)..............................21

*United States v. Aronoff*, 463 F.Supp. 454 (S.D.N.Y. 1978)...............................33, 38, 42

*United States v. Barrientos,* 485 F.Supp. 789 (E.D. Pa. 1980).........................................38

*United States v. Bein*, 539 F.Supp. 72 (N.D. Ill. 1982).....................................................38

*United States v. Benjamin*, 623 F.Supp. 1204 (D.D.C. 1985)……......21, 24, 25, 27, 30, 42

*United States v. Cashin*, 281 F.2d 669 (2d Cir. 1960)………………..........19

*United States v. Choate*, 276 F.2d 724 (5th Cir. 1960)……………....…................38

*United States v. Clark*, 360 F.Supp. 936 (S.D.N.Y. 1973)……...…..................30, 38, 44

*United States v. Coffee*, 113 F.Supp.2d 751 (E.D.Pa. 2000)……………….........21

*United States v. Donato*, 866 F.Supp. 288 (W.D. Va. 1994)……………….........32

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003)......................................................40

*United States v. Erie Basin Metal Products Co.,* 79 F.Supp. 880 (D. Md. 1948)........38-39

*United States v. Ferguson*, 432 F.Supp.2d 559 (E.D. Va. 2006)…………..….......23, 28, 29, 36

*United States v. Forbes and Shelton,* No. 2001 Cr. 140 (WDW),
(D.N.J., Newark, March 18, 2002) (Walls, J.)...............................................................….24

*United States v. Green*, 983 F.2d 100 (8th Cir. 1992)………………….................27

*United States v. Gruberg*, 493 F.Supp. 234 (S.D.N.Y. 1979)……………….........25, 34

**TABLE OF AUTHORITIES**
(continued)

*United States v. Haley*, 504 F.Supp. 1124 (E.D. Pa. 1981)................................................36

*United States v. Hanley*, No. 94 CR 394 (DAB), 1995 WL 60019
(S.D.N.Y. Feb. 10, 1995) (Batts, J.)...................................................20

*United States v. Hurwitz*, 573 F.Supp. 547 (S.D.W.Va. 1983)........................................29

*United States v. Jessup*, 38 F.R.D. 42 (M.D. Tenn. 1965)...............................38

*United States v. Johnson,* 323 U.S. 273 (1944).............................19, 29

*United States v. Layne*, No. 05 CR 87 (HB), 2005 WL 1009765
(S.D.N.Y. May 2, 2005) (Baer, J.)...................................20, 23, 30, 37

*United States v. Leining*, No. 89-10063-01, 1990 WL 11605
(D. Kan. 1990) (Theis, J.)....................................................................21

*United States v. Lima*, 94 Cr. 800, 1995 WL 348105
(N.D. Ill. June 1, 1995) (Williams, J.)....................................29

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990).............20, 22

*United States v. Martino*, No. 00 CR 389, 2000 WL 1843233
(S.D.N.Y. Dec. 14, 2000) (Casey, J.)..................................20, 23, 30, 37

*United States v. McDonald*, 740 F.Supp. 757 (D. Alaska 1990).............21, 29, 37

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008)....................................40-41

*United States v. Muratoski*, 413 F.Supp. 2d 8 (D.N.H. 2005)..............24

*United States v. Ohran*, No. 99 Cr. 142 (JSM), 2000 WL 620217
(S.D.N.Y. May 12, 2000) (Martin, J.)..................................................20, 30, 44

*United States v. Olen*, 183 F.Supp. 212 (S.D.N.Y. 1960)..................................25

*United States v. Posner*, 549 F.Supp. 475 (S.D.N.Y. 1982)..............33

*United States v. Radley*, 558 F.Supp.2d 865 (N.D. Ill. 2008)............24

*United States v. Robinson,* No. 09-0031, 2010 WL 3087446
(D.N. Ma. I., July 29, 2010) (Bennett, J.)..............................41-42

iv

## TABLE OF AUTHORITIES
(continued)

*United States v. Russell*, 582 F.Supp. 660 (S.D.N.Y. 1984)…………..……..20, 28, 34, 43

*United States v. Stephenson*, 895 F.2d 867 (2d Cir. 1990).................................................20

*United States v. Valdes*, No. 05 Cr. 156, 2006 U.S. Dist. LEXIS 12432
(S.D.N.Y. March 17, 2006)………………………………………………....24

## Federal Rules

Federal Rule of Criminal Procedure 21(b)……………………………….*passim*

Federal Rule of Criminal Procedure 21(d)……………………………….19

Fed. R. Evid. 902(11).……………………………………………………...25

## Treatises

2 Charles Alan Wright, *et al.*, *Federal Practice & Procedure*
(2d ed. 1982 & Supp. 2000)...............................................................................21

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,

                                     No. 11 CR 340 (ERK)

       -against-

MOUSA KHOULI, *et al.,*

            *Defendants,*

SALEM ALSHDAIFAT,

            *Defendant-Movant.*

-------------------------------------------------------- X

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT SALEM ALSHDAIFAT'S MOTION
FOR CHANGE OF VENUE PURSUANT TO
FEDERAL RULE OF CRIMINAL PROCEDURE 21(b)
AND CONSTITUTIONAL VENUE PRINCIPLES**

Defendant Salem Alshdaifat, by and through undersigned counsel, hereby moves to

transfer his case to the Eastern District of Michigan for trial, pursuant to Fed. R. Crim. P. 21(b)

and pursuant to the principles pronounced in the United States Constitution, art. III, § 2, cl. 3,

and amend. VI.  He respectfully submits this memorandum in support of his motion.

**I.**

**<u>INTRODUCTION</u>**

Salem Alshdaifat is charged in five counts of a nine-count Indictment in the Eastern

District of New York alleging what are essentially regulatory-based criminal charges.  Mr.

Alshdaifat is charged with a conspiracy to violate 18 U.S.C. § 545, a statute creating a criminal

offense for knowingly and intentionally violating United States Customs laws, generally by

falsely declaring items to be imported into the United States.  He is also charged with a

conspiracy to launder the proceeds received for the allegedly smuggled items, and three substantive counts of Customs violations.

The facts surrounding these charged criminal violations of the Customs laws arise out of the importation of rare Egyptian antiquities, including a three-piece set of sarcophagi and other funerary objects.  These artifacts were allegedly shipped to the United States in several packages, variously by international air mail and by private air and sea carriers.  The government does not claim that the Egyptian artifacts were stolen or were otherwise contraband when they entered the country.  Instead, the government's charges rest on a theory that the alleged conspirators willfully falsely or vaguely declared these artifacts in entry documents into the United States because the importer purportedly had insufficient or incomplete documents of origin for the objects and this *might* have caused them to be detained at a United States port-of-entry if detected.

Mr. Alshdaifat was neither the U.S. importer nor the foreign exporter of the subject Egyptian artifacts.  Based on the government's own claims, he is alleged to have been the "finder" or middleman that put the alleged foreign source of the artifacts (defendant Ramadan) in contact with the U.S. importer, or interested antiquities dealer (defendant Khouli).  Despite being charged with a role that essentially ended prior to the importation process, Mr. Alshdaifat is charged with his co-defendants for knowingly participating in making false or intentionally incomplete statements on shipping labels on various shipments of these Egyptian antiquities. The government's claims against Mr. Alshdaifat, therefore, rely on findings that he *knew and intentionally joined* a conspiracy to falsely declare the Egyptian artifacts in their shipment to the United States *after* his role in being a broker to the transactions was already completed.

Mr. Alshdaifat owns a business called Holyland Numismatics, which he has operated out of his home in Orchard Lake, Michigan since 2009.  He is principally a trader of ancient coins

with a specialty in ancient Judaean coins.  He learned his profession since childhood in his native Jordan and has become an expert in reading and identifying these coins.  Mr. Alshdaifat has purchased ancient coins before from defendant Ramadan in the United Arab Emirates ("U.A.E.") and has sold coins to defendant Khouli in New York.  That is how he knew two of the other parties charged in this Indictment.

In the Egyptian sarcophagi transactions, however, Mr. Alshdaifat only had a broker's interest and did not deal in the artifacts himself.  Somehow, however, he now finds himself charged together with the principals of those transactions for allegedly violating technical Customs laws in the mailing and shipping of the merchandise, a process in which he did not participate.  To make matters worse, Mr. Alshdaifat is charged with these criminal violations in a federal court more than 600 miles from his home and business in Michigan.

Mr. Alshdaifat lives with his wife and four young daughters in a suburb of Detroit.  Before residing there, he lived in his native Jordan, where he served many years with distinction in the Jordanian armed forces.  He also lived in Canada for several years after getting married.  He has lived in the United States for only the past two years, and then only in Michigan.  He has had little to no contacts in New York and is not charged with doing anything in New York in furtherance of the charges in this Indictment.  Indeed, the Indictment's only connection to the Eastern District of New York appears to be that some of the disputed shipments of the Egyptian artifacts arrived in the United States at Kennedy International Airport (and even that has yet to be proved through any evidence produced by the government in discovery at this time).

Mr. Alshdaifat cannot fairly defend himself in this prosecution in federal court in Brooklyn.  The government has acted to make it almost impossible for him to defend himself adequately at trial there.  It has done so by outrageously knocking Mr. Alshdaifat out of business

3

for reasons unrelated to the charges in this case and without support in law, and by putting him and his family in a position where his wife needs to work to support the family and he needs to care for their four young children at home.  Because of the government's conduct here, the equities require and the interests of justice are best served by a finding that the case against Mr. Alshdaifat be tried in the Eastern District of Michigan.

The United States Supreme Court has set a multi-factor test to determine whether a trial court should transfer a case to another federal district for reasons of convenience and fairness under Rule 21(b) of the Federal Rules of Criminal Procedure and constitutional venue law.  In this memorandum, Mr. Alshdaifat explains the reasons why the factors in his case merit transfer of venue.

Mr. Alshdaifat's circumstances are particularly extraordinary.  These include the fact that from his initial arrest, the government stacked the deck against him, making it untenable for him to get his fair day in court.  On July 13, 2011, the government arrested Mr. Alshdaifat in his Michigan home and confiscated his *entire* business inventory of ancient coins, thereby effectively shutting his business down.  It did so despite the fact that the criminal charges in the Indictment had nothing to do with Mr. Alshdaifat's coin business.  Subsequently, the government returned his coins but not until his business suffered a crushing, and possibly, fatal blow.  Mr. Alshdaifat's reputation as an honest coin dealer has been battered; more importantly, he has been removed or suspended from all of the auction houses where he sold his coins.  His business is in dire shape.

Mr. Alshdaifat is only 37 years old.  He is the father of four young girls, ages 2 through 9.  After his business was basically shut down, Mr. Alshdaifat's wife, Vincenza Butera, assumed the role of financial provider for their family.  She is a child protective services officer in

Ontario, Canada for the Windsor Essex Children's Aid Society.  She works full time, more than 40 hours per week.

Mr. Alshdaifat has become the primary caretaker at home for their four young children. Their eldest child, M.A., age 9, recently underwent surgery removing an ovarian tumor and she continues to suffer health problems related to her condition.  Mr. Alshdaifat is the parent primarily responsible for responding to any of M.A.'s emergency health needs.  He has been attending her medical procedures and doctor visits since his arrest.

Mr. Alshdaifat is also under strict home detention with electronic monitoring as a condition of his bail.  He does not even have permission to leave his home to work on revitalizing his business.  First, the government knocked Mr. Alshdaifat out of business for reasons unrelated to the criminal charges in Brooklyn.  Next, it sought detention or bail conditions that ensured that he would not be able to recover his business before trial.  Then, it charged him in a court over 600 miles away to defend a case in which his role concededly was extremely limited, and in a venue in which he never is alleged to have performed a single act.

Mr. Alshdaifat has limited financial means to travel and work with his attorney in New York to prepare for trial.  He has escalating and dire family obligations in Michigan that he must attend to, or threaten the financial and physical well being of his family.  He must relieve family pressures from his wife, who now acts as the family's financial provider based on her salaried position with health benefits.

Physically, Mr. Alshdaifat also is not doing well.  He suffers from chronic migraine headaches and has recently been diagnosed with a degenerating tear in his knee -- the result of a military injury during his service in the Jordanian army.

The government cannot show that it has non-government witnesses in New York who are relevant to the charges against Mr. Alshdaifat.  In contrast, all of Mr. Alshdaifat's witnesses hail from Michigan, or just across the border in Canada.

There are no compelling reasons for the government to try this case in New York.  Mr. Alshdaifat cannot fairly defend it there.  For the following reasons, this Court should grant Mr. Alshdaifat's motion and transfer his case to the Eastern District of Michigan.

## II.

## FACTUAL BACKGROUND

Salem Alshdaifat was arrested at his home in Orchard Lake, Michigan on July 13, 2011 on a sealed Indictment that was returned in the Eastern District of New York on May 4, 2011. (ECF Dkt. No. 10.)  He is charged in five of the nine counts of the Indictment, 11 Cr. 340 (ERK), principally with criminal violations of U.S. Customs laws involving the importation of a set of Egyptian sarcophagi[1] and other funerary objects in 2009.

Previous proceedings in this matter included a two-day evidentiary detention hearing on July 14-15, 2011, before Magistrate Judge R. Steven Whalen in the Eastern District of Michigan, where Mr. Alshdaifat initially appeared under Rule 5 of the Federal Rules of Criminal Procedure. The hearing included two days of testimony from Special Agent Pietro Ciranni, a local Detroit federal agent from the Immigration and Customs Enforcement (ôICEö) agency of the Department of Homeland Security (ôDHSö).  Parties also introduced documentary evidence and proffered

---

[1]      The Indictment uses the term õsarcophagusö and õsarcophagiö to describe the artifacts that are alleged to have been smuggled into the United States.  õSarcophagusö is defined in the Merriam-Webster English Dictionary (2010 ed.) as õa stone coffin,ö from the Latin *sarcophagus (lapis)*, limestone used from coffins, and from the Greek (*lithos*) *sarkophagos*, literally, flesh-eating stone.  However, the coffins at issue in this case are wooden, and not stone.  Accordingly, the term õcoffinö is used interchangeably herein with the term õsarcophagusö that is found in the Indictment.

testimony relating to U.S. and Canadian border crossing regulations. At the conclusion of the hearing, Magistrate Judge Whalen denied the government's motion for pretrial detention and set bail in the amount of $100,000, as an unsecured personal recognizance bond to be co-signed by the defendant's wife, Vincenza Butera, who was also directed to be Mr. Alshdaifat's custodian. Magistrate Whalen further ordered Mr. Alshdaifat to be fitted with an electronic monitoring device and be given a night curfew. His travel was limited to the Eastern Districts of Michigan and New York and points in between for travel to and from court, and no international travel. (Michigan Detention Hearing Tr., 7/15/2011, pp. 19-27, attached at Ex. C.[2])

The government appealed Judge Whalen's bail order to the United States District Court for the Eastern District of New York, where the charges were pending. A telephonic hearing (outside the presence of the defendant) was held in Brooklyn before the assigned Miscellaneous Judge, the Honorable John Gleeson, on July 19, 2011. (ECF Dkt. No. 20.) Over the government's objection and continued motion for detention, the Court approved a set of more stringent bail conditions than that set in Michigan, including principally: (1) a bond in the amount of $500,000; (2) secured by the family's home; (3) strict home detention with electronic monitoring, with approved travel by Pretrial Services limited to legal, religious, and medical visits; (4) surrender of all passports, including surrender of Mr. Alshdaifat's children's passports; (5) and a waiver, on the record, of Mr. Alshdaifat's right as a Canadian citizen to contest extradition from Canada to the United States if he were found in Canada during the pendency of these proceedings. (*Id.*; Dkt. No. 20, email attachment.) Under these conditions, Mr. Alshdaifat was released from custody on July 20, 2011 in Michigan, after spending one week in a Michigan county detention facility.

---

[2] "Ex." refers to the exhibits annexed to the Defendant's Notice of Motion to Transfer Venue that accompanies this Memorandum of Law and is filed together herewith.

Mr. Alshdaifat was arraigned before this Court at an initial hearing on August 18, 2011. He pled not guilty on all counts, and the case has been adjourned until January 27, 2012 to allow the parties to complete discovery. (ECF Dkt. No. 34.)

**A.  The Indictment and its Nexus to the Eastern District of New York**

The basis on which the government relies for establishing venue in the Eastern District of New York is minimally stated in the Indictment.  While each count is prefaced with the obligatory language that the charged conduct occurred õwithin the Eastern District of New York and elsewhere,ö the facts which follow are short on specifics.

The Indictment charges two conspiracies in Counts One and Two:  (1) a conspiracy to smuggle into the United States a set of Egyptian artifacts, namely a set of Egyptian coffins and other funerary objects; and (2) a money laundering conspiracy involving the proceeds from the sale of these allegedly smuggled artifacts.  It further charges substantive smuggling offenses in Counts 3 through 7, stemming from the smuggling conspiracy.  Finally, Counts 8 and 9 also charge defendant Khouli alone with making false statements to a federal officer.

The Indictmentøs factual description of the defendants and their alleged conduct do not claim that the defendants committed any acts in furtherance of the charged conspiracies in this district.  In the section of the Indictment entitled, õThe Defendants,ö the government alleges:  (1) Defendant Mousa Khouli õpurchased antiquities located abroad and sold merchandise through Windsorøs gallery in **New York, New York**, and through Internet websitesö (Indictment, ¶  5) (emphasis added); (2) Defendant Salem Alshdaifat õoperated a business called Holyland Numismatics [], which maintained a mailing address in **West Bloomfield, Michigan**ö (Indictment, ¶ 6) (emphasis added); (3) Defendant Joseph Lewis õwas a collector of Egyptian antiquities,ö (Indictment, ¶ 7), and according to the governmentøs discovery, resided and

8

maintained his collections in his home in **Chesterfield, Virginia**; and (4) Defendant Ayman Ramadan, "was an antiquities dealer who operated a company called Nafertiti Eastern Sculptures Trading ("NEST") in **Dubai, United Arab Emirates**." (Indictment, ¶ 8)  None of these locations are within the Eastern District of New York.[3]

The conduct alleged in the Indictment could be summarized as follows:  the purchase and sale of a three-piece set of ancient Egyptian coffins and other funerary objects from a source in Dubai, U.A.E. (*i.e.,* defendant Ramadan) to an antiquities dealer in New York, New York (*i.e.,* defendant Khouli), through an intermediary or broker in Michigan (*i.e.,* defendant Alshdaifat), and their eventual purchase by a collector in Virginia (*i.e.,* defendant Lewis).  The items were alleged to have been shipped into the United States in installments through international mail, and by private air and sea cargo.  The Indictment generally claims that the items were shipped using "false declarations to Customs about the country of origin and value of Egyptian antiquities," and "using vague and misleading descriptions on shipping labels and Customs paperwork . . . to avoid detection and scrutiny by Customs." (Indictment, ¶ 13.)

The only apparent connection that these transactions have to the Eastern District of New York is that at least some of the air cargo shipments from Dubai, U.A.E. apparently first entered the United States at Kennedy International Airport in Queens, New York.  Specifically, the Indictment charges that "[o]n or about November 16, 2008, [defendant] RAMADAN caused a Greco-Roman style Egyptian sarcophagus to be shipped by air from the UAE to John F. Kennedy International Airport." (Indictment, ¶16b)  Regarding a different shipment, the Indictment alleges that "[o]n or about May 13, 2009, [defendant] RAMADAN sent to [defendants] KHOULI and ALSHDAIFAT an airway bill showing that a package described as a

---

[3]     The defendant Ayman Ramadan is not before the Court in this matter.  Apparently, he resides in the U.A.E. and has yet to make himself available to the Court's jurisdiction.

wooden panel—was being shipped by NEST from Dubai, UAE to a third party consignee via JFK [Airport]." (Indictment, ¶ 16d)  These are the **only** facts alleged in the Indictment to have occurred in the Eastern District of New York.[4]

### B. Salem Alshdaifat's Substantial Connection to the Eastern District of Michigan and the Extreme Hardship of Defending This Case in Brooklyn Federal Court

The defendant Salem Alshdaifat has no connection to the Eastern District of New York. During the period charged in the Indictment, he resided and operated an ancient coins trading business in either Canada or within the Eastern District of Michigan. (Alshdaifat Decl., Ex. A, at ¶¶ 7-13.)[5]  Despite these facts, Mr. Alshdaifat finds himself having to defend several federal felony charges with a potential combined maximum sentence of 85 years in a court that is more than 600 miles from his home and business.

---

[4]     With respect to the first mentioned air shipment of a Greco-Roman style coffin in November 2008, it is notable that Mr. Alshdaifat is **not** charged in the substantive smuggling count for that particular artifact. *See* Count 3 of the Indictment, ¶ 20.  Thus, the only event alleged to have occurred in the Eastern District of New York involving Mr. Alshdaifat was the possible entry of an air cargo shipment in May 2009 of pieces of an Egyptian coffin through Kennedy Airport. *See* Count 6 of the Indictment, ¶ 20.  It is further worth noting that while the Indictment alleges that a copy of an "airwaybill" was sent to Mr. Alshdaifat (apparently by email), indicating that a package was to be shipped to Kennedy Airport, the Indictment does not state whether that shipment was sent as stated in the emailed copy of the airway bill, *i.e.,* whether the goods were actually shipped as described on the bill to Kennedy Airport on the specified Emirates Air flight.  As of the date of this motion, the government has yet to provide discovery, requested by Mr. Alshdaifat, evidencing the United States ports-of-entry for the charged smuggled shipments (although the prosecutor has told counsel that such discovery would be forthcoming).

[5]     "Alshdaifat Decl." refers to the declaration of Salem Alshdaifat, dated November 21, 2011, and attached at Exhibit A to Defendant Alshdaifat's Notice of Motion to Change Venue, filed together with this Memorandum of Law.  All references to exhibits herein refer to those exhibits annexed to the accompanying Notice of Motion filed herewith.

The fact that Mr. Alshdaifat is charged in a distant federal court has caused him a number of debilitating inconveniences that together raise significant questions of fairness of venue in these proceedings.

1.  Choice of Counsel

Mr. Alshdaifat has retained counsel local to the area of the Court rather than from the area of his residence in Michigan. (Alshdaifat Decl., ¶ 35.)  This decision was based on his belief that it was in his best interest to have a lawyer admitted to the local bar of the Court where the charges are pending, who practices regularly in that Court, and who frequently defends cases prosecuted by the U.S. Attorney's Office for the Eastern District of New York. (*Id.*)  Of course, because Mr. Alshdaifat is being prosecuted in a Court more than 600 miles from his home,[6] he confronted the difficult choice of either hiring a lawyer local and familiar to the Court and prosecutor's office, or one who would be more accessible to him during his home confinement on bail in Michigan.  As Mr. Alshdaifat stated in his annexed affirmation, he has had little access to his lawyer other than by telephone, and has not met with his lawyer since his first court appearance in August. (*Id.* at ¶ 36.)

2.  Financial and Family Burdens Exacerbated by Charges in Distant Court

Salem Alshdaifat is 37 years old. (*Id.* at ¶ 3.)  He was born in Jordan and is a citizen of that country and of Canada. (*Id.*)  In or about 2000, he moved to Ontario, Canada with his wife, who is also a Canadian citizen. (*Id.* at ¶¶ 6-7.)  He has four children, ages 2 through 9. (*Id.* at ¶ 2.)  In 2009, Mr. Alshdaifat moved his family to Orchard Lake, Michigan, and shortly thereafter received legal permanent residence status in the United States. (*Id.* at ¶ 3.)

---

[6]     This distance was calculated using Google Maps, by inserting Brooklyn, New York and Detroit, Michigan as arrival and destination points under the website's travel distance parameters.  *See* maps.google.com.

Mr. Alshdaifat is a numismatist, who particularly specializes in the study of ancient coins. (*Id.* at ¶¶ 9-12.)  He developed this hobby as a child in Jordan and it later blossomed to a profession. (*Id.* at ¶ 8.)  After he completed twelve years of Jordanian military service, he decided to convert his passion for studying ancient coins into a business. (*Id.* at ¶¶ 4, 8.)  He moved with his wife, Vincenza Butera, to her home in Canada, and started his business in trading ancient coins. (*Id.* at ¶¶ 6-8.)  His particular expertise is in rare coins minted by ancient civilizations – Judaean, Ptolemic, Roman, Byzantine – that inhabited the region we now call the Middle East, including his native Jordan. (*Id.* at ¶¶ 8-12.)

Mr. Alshdaifat largely runs his business from his home, where he stores the bulk of his inventory, other than coins he has consigned to other dealers. (*Id.* at ¶ 15.)  He buys and sells coins at various auction houses worldwide, including Internet-based auctions, such as V-Coins and V-Auctions. (*Id.* at ¶¶ 10-11.)  His business is largely reputation-driven:  because authenticity is always an issue in this trade, a dealer's reputation is critical for obtaining approval from international auction houses to post merchandise on their sites. (*Id.* at ¶ 11.)  Prior to his arrest in this case, Mr. Alshdaifat had an impeccable record as a dealer in authentic ancient coins and was granted admission to many of the major international auction houses, including some of the most prominent in the world such as Heritage and the Ancient Coin Collectors Guild. (*Id.* at ¶¶ 10-11.)

All of this changed upon his arrest on July 13, 2011.  On this date, more than ten federal law enforcement agents stormed Mr. Alshdaifat's house in Orchard Lake, Michigan. (*Id.* at ¶ 14.)  They raided the house in the early morning hours with guns drawn to find Mr. Alshdaifat, his wife, and their four daughters, ages 2 through 9. (*Id.*)  The agents executed arrest and search warrants, taking Mr. Alshdaifat in federal custody and searching the home for evidence of

12

unlawfully imported contraband.  The agents indiscriminately seized more than 7,000 ancient coins from Mr. Alshdaifat's home, which represented his entire business inventory stored there. (*Id.* at ¶ 15.)  The seizure of these coins was not related to the charges facing Mr. Alshdaifat in this Court.  In fact, the government has impliedly conceded that it was without probable cause to seize ***any*** of these coins by returning ***each and every coin*** taken in the early morning raid of Mr. Alshdaifat's family home. (*See* Tr. 8/18/11 Hearing, ECF Dkt. No. 34, and Release and Hold Harmless Agreement,8/31/2011, at Ex. D.)

Despite the government's return of Mr. Alshdaifat's inventory of ancient coins, his business has been largely ruined by his arrest and indictment. (*Id.* at ¶¶ 15, 18-19.)  His memberships in the auction houses where he trades most of his merchandise have been suspended pending the outcome of this case. (*Id.* at ¶ 18.)  Therefore, Mr. Alshdaifat's income has been drastically reduced as a result of the charges here. (*Id.*)

Since his arrest, Mr. Alshdaifat's family has come to rely on the income of his wife, Vincenza Butera. (*See* Butera Decl., Ex. B, at ¶ 7.)[7]  Ms. Butera works full time as a court officer in Windsor, Ontario, employed by the Windsor Essex Children's Aid Society, a judicially authorized child protective services agency. (*Id.* at ¶ 3.)  She works five days per week and often more than 40 hours per week. (*Id.* at ¶ 4.)  Because the family has four children, 9 years old or younger, Mr. Alshdaifat has had to contribute in providing day care for the children while his wife works. (*Id.* at ¶¶ 9-11; Alshdaifat Decl. at ¶¶ 26-31.)  Of course, this is basically his only option since his business has been devastated by news of his arrest and his bail conditions confine him to the home. (*Id.* at ¶¶ 17-18.)

---

[7]     "Butera Decl." refers to the declaration of Mr. Alshdaifat's wife, Vincenza Butera, dated November 21, 2011, and attached at Exhibit B to Defendant Alshdaifat's Notice of Motion to Change Venue, filed together with this Memorandum of Law.

Because Mr. Alshdaifat's defense in this case will require recurring travel to New York to meet with his attorney or attend court hearings and trial, this will create substantial hardships on the family.  As stated above, Mr. Alshdaifat is now the principal day care provider for his four young children. (*Id.* at ¶¶ 26-32.)  When he is unavailable, the family will have to find an alternative day care provider or risk the loss of Ms. Butera's job. (*Id.* at ¶ 34; Butera Decl. at ¶¶ 5-7, 9.)  She has limited ability to take extended leave in her position, and her job has become the primary source of her family's income. (*Id.*)  Moreover, there are no extended family options available to Mr. Alshdaifat and Ms. Butera to assist in child care. (*Id.* at ¶ 11; Alshdaifat Decl. at ¶¶ 28, 32.)  Mr. Alshdaifat has no family in the United States other than a younger brother who attends college full time. (*Id.* at ¶ 32.)  Ms. Butera's parents live across the border in Ontario, Canada, but her father recently underwent triple by-pass surgery and is convalescing at home with the aid of his wife. (Butera Decl. at ¶ 11.)  Because Mr. Alshdaifat's bail conditions required him to surrender his and his children's Canadian passports, he no longer has the ability to transport the children to their grandparents' house for child care support. (Alshdaifat Decl. at ¶¶ 26-27.)

In addition to these logistical day care concerns, the Alshdaifat family also is confronting serious health problems affecting their eldest daughter, M.A., age 9.  M.A. recently had surgery removing an ovarian tumor. (Alshdaifat Decl., ¶ 29; Butera Decl., ¶ 10.)  This surgery was a response to recurring symptoms that were debilitating the young girl. (*Id.*)  The surgery was only one part of her medical treatment, and M.A. continues to undergo a battery of invasive tests, such as colonoscopies and endoscopies, to monitor her condition and help detect any other problems. (Alshdaifat Decl., ¶ 29.)  As a result of these health issues, M.A. has had many school absences and bouts of illnesses at school. (*Id.* at ¶ 30.)  This unpredictable medical condition makes it even

14

more "imperative" that a parent be available at short notice to deal with her health problems. (*Id.*)
Mr. Alshdaifat is the parent who primarily has had responsibility to respond to M.A.'s health
problems at school and to accompany her on her medical visits and procedures. (*Id.*)  Because
Mr. Alshdaifat is at home during the day and his wife works across an international border, he is
best able to respond quickly to any emergency needs. (*Id.*)

There are no other family options other than to have Mr. Alshdaifat assume child care
duties.  Otherwise, the family would have to resort to costly private day care services – for four
children on different schedules and with disparate needs – and this option is severely limited by
Mr. Alshdaifat's loss of business income. (Alshdaifat Decl. at ¶ 34.)

3.   Mr. Alshdaifat's Physical Health is Best Served by Trial Close to Home

Mr. Alshdaifat suffers from chronic migraine headaches. (*Id.* at ¶ 40.)  He currently is
under treatment for migraines by Dr. Rashid Alsabeh in West Bloomfield, Michigan. (*See*
Defendant's Medical Records, at Ex. E.)  Dr. Alsabeh has prescribed 550 mg tablets of naproxen
sodium to manage pain for this condition. (*Id.*)  As recently as January 2011, Mr. Alshdaifat was
hospitalized at the Henry Ford Medical Center in West Bloomfield for severe head and eye pain
and numbness in the face. (*Id.*)  He received oral and intravenous pain and anti-inflammatory
medication during his hospital visit. (*Id.*)  At that time, he was instructed to visit regularly with
his internist to manage pain and migraine outbreaks.

Dr. Alsabeh recommends that, due to Mr. Alshdaifat's susceptibility to severe migraines,
he manage his stress, by remaining in safe and comfortable environments. (Alshdaifat Decl., ¶
40.)  Mr. Alshdaifat's treating physician instructed him that increasing stress, including extended
travel alone, would likely cause new migraine outbreaks. (*Id.*)

By avoiding such travel, Mr. Alshdaifat also would insure immediate access to his treating physician and also have his wife and neighbors available to assist if he were suddenly stricken by migraine pain.  In stark contrast, Mr. Alshdaifat will be entirely alone in New York. He has no family or close friends in New York to assist or comfort him in any way. (*Id.* at ¶ 39.)

Also, Mr. Alshdaifat was recently informed after undergoing a Magnetic Resonance Imaging ("MRI") test on his left knee last month that he might be facing knee reconstruction surgery to deal with an injury he originally suffered while performing his military service in Jordan. (*Id.* at ¶ 41; Medical Records at Ex. E.)  The MRI exam revealed that he has a "degenerative tear of the medial meniscus," "advanced osteoarthrosis of the medial compartment," and a "loose body" in the same area. (MRI Test Results Letter, 10/17/2011, p. 2, at Ex. E.)  Because Mr. Alshdaifat has been dealing with "[c]hronic worsening pain," it is highly possible that he will need surgery in the near term. (*Id.*)  He has an appointment scheduled with an orthopedic surgeon to determine whether surgery is recommended. (Alshdaifat Decl., ¶ 41.) Of course, if Mr. Alshdaifat requires knee surgery, his ability to travel will be further complicated.

### C.  Location of Government and Defense Witnesses

While at this early stage of the proceedings, the government has yet to produce a witness list for trial, it appears from its discovery production that its witnesses will largely be government agents or other employees.  This case is a document-intensive case, resting largely on the introduction of documents evidencing the entry into the United States of various international shipments, and email correspondence of the defendants seized by the government pursuant to search warrants.  Accordingly, the government presumably will have to call representatives from Customs and Border Protection ("CBP" or "Customs") to introduce copies

16

of records of the relevant importation shipments and testimony regarding the importation process and regulations more generally.  Other relevant testimony might include custodians of records from the United States Postal Service, Emirates Post (from the U.A.E.), bank representatives to introduce bank documents evidencing wire and money transfers, and perhaps a custodian of records for Emirates Air, which was one of the private carriers of the disputed shipments.  Some of this witness testimony might be stipulated to by the parties and not require live testimony at all.  Finally, the government has given notice of expert testimony that it will seek to introduce on topics including U.S. Customs laws and Egyptian law pertaining to the exportation and ownership of Egyptian antiquities. (*See* Government Discovery Letter, 8/11/2011, ECF Dkt. No. 30, at p. 6.)  It is not clear by the government's discovery that there are many non-government fact witnesses who will be part of its case-in-chief, and therefore, the witnesses will largely be in the government's control.

Also, if Mr. Alshdaifat were to be tried alone in federal court in Michigan (which would be the result if the Court granted his motion to transfer venue), the government's witness list would be further reduced.  Mr. Alshdaifat is not charged in Counts 3, 7, 8 and 9, and any evidence of events particular to these counts would likely not be introduced or would be irrelevant.  For example, Count 7 involves allegations of false declarations on a sea cargo importation shipment to which Mr. Alshdaifat was not a party.  For this count, the discovery shows that one of the co-defendants hired a private shipping company and New York City Customs brokerage agency to prepare the formal entry paperwork for that shipment.  These potential New York witnesses would not be relevant in a trial against Mr. Alshdaifat and, therefore, there would be no inconvenience to the government as to these witnesses if Mr. Alshdaifat's trial were transferred to Michigan.

17

There also are a number of witnesses from Detroit that the government will inevitably call at Mr. Alshdaifat's trial. The government will likely seek the testimony of ICE Special Agent Pietro Ciranni, who testified at Mr. Alshdaifat's detention hearing and who interviewed Mr. Alshdaifat at the time of his arrest and managed the search and seizure of Mr. Alshdaifat's home. (*See* Gov. Discovery Letter, 9/1/2011, ECF Dkt. No. 36.) Also, the government has informed the defense that it may seek to introduce evidence from an administrative Customs seizure of Mr. Alshdaifat's importation of ancient coins and of a voluntary return of coin packages that Mr. Alshdaifat produced to CBP in Detroit. To the extent the government seeks admission of these events at Mr. Alshdaifat's trial, the witnesses will all be from Detroit. Finally, to the extent that any banking custodians are required to introduce bank documents relating to Mr. Alshdaifat relevant to the money laundering conspiracy charged in Count 2, these witnesses will be local to Detroit, which is where Mr. Alshdaifat did his banking. (*See* Gov. Discovery Letter, 8/11/2011, ECF Dkt. No. 30) (referring to Mr. Alshdaifat's Detroit banking activity at KHOULI 3317-3592).

As to defense witnesses, Mr. Alshdaifat is prepared to make an *in camera* submission of the names and locations of those witnesses he is currently contemplating calling at trial in his defense. Because he conducted much of his business in the Detroit area, out of his home, and the people he dealt with on a personal everyday level are from the Detroit area, most of his fact and character witnesses reside and work in Detroit. Mr. Alshdaifat is currently unaware of any witnesses he would call from the New York City area.

18

# III.

# ARGUMENT

## A.  Legal Standard

Federal Rule of Criminal Procedure 21(b) provides:

> **For Convenience.**  Upon the defendant's motion, the court may
> transfer the proceeding, or one or more counts, against that
> defendant to another district for the convenience of the parties, any
> victim, and the witnesses, and in the interest of justice.

Fed. R. Crim. P. 21(b) (West 2010).  The timing of a transfer motion is governed by Federal

Rule of Criminal Procedure 21(d) which states that "[a] motion to transfer may be made at or

before arraignment or at any other time the court or these rules prescribe." *Id.* at 21(d).

While the rule vests broad discretion in the trial court to determine whether the interests

of justice dictate transfer, the exercise of this discretion is guided by both constitutional principle

and case law.

In *United States v. Johnson,* 323 U.S. 273, 276 (1944), Justice Frankfurter wrote:

> Questions of venue in criminal cases . . . are not merely matters of
> formal legal procedure.  They raise deep issues of public policy in
> the light of which legislation must be construed.

As the Supreme Court and many other courts have long recognized, it can be a severe hardship

for a defendant to face trial far away from home and from "appropriate facilities for defense." *Id.*

at 275.  Courts have stated, therefore, that as a matter of policy, a defendant should ordinarily be

tried, whenever possible, in the district where he resides. *See, e.g., Hyde v. Shine*, 199 U.S. 62,

78 (1905); *United States v. Cashin*, 281 F.2d 669, 675 (2d Cir. 1960) (re-emphasizing the

importance the *Shine* Court placed on trial in a defendant's district of residence).

In addition to the location of the defendant's home and business, the Supreme Court enumerated several other factors which a trial court should consider in determining a defendant's motion to transfer venue, all of which are directed at ensuring fairness in the trial process:

> (1) location of [ ] defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer.

*Platt v. Minnesota Mining & Mfg. Co.,* 376 U.S. 340 (1964).  The *Platt* Court stressed, however, that this set of factors was neither exhaustive nor exclusive. *Id.*

The Second Circuit, in examining the *Platt* factors, further instructed that:  "No one of these considerations is dispositive, and [i]t remains for the court to strike a balance and determine which factors are of greatest importance." *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) (quoting *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990)).  In determining which factors are of "greatest importance," district courts within the Second Circuit have accorded "greater weight to the defendant's interest in being tried in the district of his residence than to any other factor." *United States v. Layne*, No. 05 CR 87 (HB), 2005 WL 1009765, at *2 (S.D.N.Y. May 2, 2005) (Baer, J.) (quoting *United States v. Ohran*, No. 99 CR 142 (JSM), 2000 WL 620217, at *3 (S.D.N.Y. May 12, 2000) (Martin, J.)); *see also United States v. Martino*, No. 00 CR 389, 2000 WL 1843233, at *6 (S.D.N.Y. Dec. 14, 2000) (Casey, J.) ("Most relevant [ ] is the location of the defendant."); *United States v. Hanley*, No. 94 CR 394 (DAB), 1995 WL 60019, at *2 (S.D.N.Y. Feb. 10, 1995) (Batts, J.) ("[A]s a matter of policy, a defendant should ordinarily be tried, whenever possible, where he resides.") (citations omitted); *United States v. Russell*, 582 F.Supp. 660, 662 (S.D.N.Y. 1984) ("Unquestionably, it

can be a hardship for defendants to stand trial far away from home.  As a matter of policy,

therefore, whenever possible, defendants should be tried where they reside.ö).

These öso-called *Platt* factors may be considered individually although judgment

ultimately rests upon an overview.ö *United States v. Benjamin*, 623 F.Supp. 1204, 1212 (D.D.C.

1985).  Moreover, courts have öliberally construed [Rule 21(b)] so as to minimize inconvenience

to a defendant.ö *Id.* at 1211 (*quoting United States v. Amador Casanas*, 233 F. Supp. 1001, 1003

(D.D.C. 1964).  Indeed, ö[n]othing in Rule 21(b) or in the cases interpreting it place on the

defendant seeking a change of venue the burden of establishing truly compelling circumstances

for such a change.  It is enough if, all relevant things considered, the case would be better off

transferred to another district.ö *United States v. Coffee*, 113 F.Supp.2d 751, 770 (E.D.Pa. 2000)

(*quoting Matter of Balsimo*, 68 F.3d 185, 187 (7th Cir. 1995) (Posner, C.J.)) (*quoted* in 2 Charles

Alan Wright, et al., *Federal Practice & Procedure* § 344 at Supp. 88 (2d ed. 1982 & Supp.

2000)).  *See also, United States v. McDonald*, 740 F.Supp. 757, 762 (D. Alaska 1990) (ö[t]he

primary concern of Rule 21(b) is to minimize the inconvenience to the defenseö) (internal

citation omitted); *United States v. Leining*, No. 89-10063-01, 1990 WL 11605, *2-*3 (D. Kan.

1990) (Theis, J.) (setting forth the *Platt* factors and observing öthat the first five factors have the

most significance.ö).

   **B.  In Mr. Alshdaifat's Case, the *Platt* Factors and the Historical Constitutional
   Principle of Avoiding Undue Hardship to Criminal Defendants Because of the
   Government's Choice of Venue Weigh in Favor of Transfer to the Eastern District
   of Michigan**

   In this case, at least seven of the ten *Platt* factors ó Mr. Alshdaifat's location; the location

of the majority of the likely defense witnesses and location of several government witnesses; the

location of Mr. Alshdaifat's relevant conduct at issue; the disruption of Mr. Alshdaifat's family

life and attempts to restart his failing business; the balance of expenses to the parties and the

witnesses; the docket condition of the two courts involved; and other "special elements" – weigh strongly in favor of transferring the case against Mr. Alshdaifat to his home and business district, the Eastern District of Michigan.  The remaining *Platt* factors are either neutral or not relevant to the analysis of this motion.  In any case, as the Second Circuit stated in *Maldonado-Rivera*, 922 F.2d at 966, the evaluation of these factors should not be reduced to a mathematical accounting, but rather should be balanced based on the greatest actual hardships identified by the parties. *Id.*

    1.  <u>Mr. Alshdaifat's Residence and Family Obligations Strongly Merit a Change of Venue</u>

As has been shown above, the single most important *Platt* factor is the location of the defendant.  Mr. Alshdaifat and his family maintain a residence in Michigan.  His business has been largely ruined by the news of his arrest in this case, and the government's unlawful seizure of his entire business inventory during the execution of a search warrant of his home. (*See* Alshdaifat Decl., ¶¶ 15, 18-20; Butera Decl., ¶ 7.)  Indeed, based on the informal disclosures made by Customs at the time they seized Mr. Alshdaifat's ancient coins, they have called into question an entire industry's practice, *i.e.,* whether ancient coins imported from the Middle East can be properly admitted into this country at all without complete provenances of these non-unique and fairly ubiquitous items.

Because of this uncertain business future, Mr. Alshdaifat must now rely on the salary of his wife to support the family financially. (*Id.*)  His family role, therefore, has shifted drastically since his arrest from financial provider to primary caretaker for their four young children – all under the age of ten.

Mr. Alshdaifat has a particular need to care for his eldest daughter, M.A., age 9.  She recently had surgery to remove a tumor on one of her ovaries. (Alshdaifat Decl., ¶ 29.)  Because she still suffers symptoms related to this condition, Mr. Alshdaifat needs to be the parent who is

immediately available in case of an emergency at school or elsewhere. (*Id.* at ¶ 30.)  Ms. Butera cannot be the parent with primary responsibility for responding to any immediate health problems that might arise from M.A.'s condition because Ms. Butera works on the other side of the international border in Canada and cannot always make it back very quickly. (*Id.*)  Therefore, Mr. Alshdaifat has taken on the role of being the primary contact with M.A.'s school to deal with any sudden illnesses that might affect her and her still uncertain medical condition. (*Id.*)

There are no other family options for the care of Mr. Alshdaifat's children. (Alshdaifat Decl., ¶¶ 28, 32; Butera Decl., ¶ 11.)  If Mr. Alshdaifat needs to relocate to New York for any extended period of time to attend court hearings, prepare his defense with his lawyer, and try this case, he will be without child care options. (Alshdaifat Decl., ¶¶ 33-34.)  If his wife must remain home with the children, or is forced to take considerable amounts of time off from her job to provide child day care, she will lose the only steady income that is now available to the family. (Butera Decl., ¶ 6.)  The family cannot now afford to pay child care services for four children and also meet basic family expenses. (Alshdaifat Decl., ¶ 34; Butera Decl., ¶ 8.)

Indeed, if one compares Mr. Alshdaifat's distressing family circumstances with defendants in other cases where trial courts exercised their discretion to transfer cases to the district courts of the defendants' residences, one cannot deny that his hardships are unmistakably move severe.  *See e.g., Martino*, 2000 WL 1843233, at *6 (finding hardship for defendant who was without dependents who relied on her, in defending case in New York rather than near home in Florida because "[defendant] and her husband will have to bear the cost of housing and food, and must suspend their Florida-based business activities during the length of the trial"); *United States v. Ferguson*, 432 F.Supp.2d 559, 563-64 (E.D. Va. 2006) (in massive billion-dollar accounting fraud case involving high-level and well compensated corporate executives of

General Reinsurance Corp., district court granted transfer to district court of residence of defendants, largely based on findings that defendants were long-time residents of Connecticut and lived short distances from federal courthouses there and defense witnesses also hailed from Connecticut); *United States v. Forbes and Shelton,* No. 2001 Cr. 140 (WDW), (D.N.J., Newark, March 18, 2002) (Walls, J.) (in another massive accounting fraud case involving the chief executive officer and chairman of the board of directors of Cendant Corp., district court granted defendants' motion to transfer case to Connecticut, where defendants resided, largely on grounds that defendants' spouses, who were primary caregivers of children at home would be unable to attend their spouses' trial because of distance from home to the New Jersey courthouse).

Under Rule 21(b) case law, minimizing familial disruption is an important consideration related to the location of the defendant, and here, it overwhelmingly weighs in favor of transfer. *See, e.g., United States v. Radley*, 558 F.Supp.2d 865, 877 (N.D. Ill. 2008) (granting transfer and giving significant weight to proximity to family and extended support network in Houston, defendant's place of residence); *United States v. Valdes*, No. 05 Cr. 156, 2006 U.S. Dist. LEXIS 12432, at *14 (S.D.N.Y. March 17, 2006) (granting transfer and noting that "family obligations including the care of children, militates in favor of transferring proceedings to the district in which a defendant resides."); *United States v. Muratoski*, 413 F.Supp. 2d 8, 11 (D.N.H. 2005) (granting transfer in part due to defendant's parenting responsibilities to minor children).

In contrast to the importance of the defendant's location, the location of government attorneys is not a significant factor.  The *Benjamin* court noted that "[t]he United States is ubiquitous." 623 F.Supp. at 1212.  As such, "the Department of Justice [and other Federal agencies] are, or should be, ‑at home,'not only in Washington, D.C., but also in [ ] any other place . . . elsewhere in which a federal court sits. . . [while these defendants] are only ‑at home'

24

in [their place of residence].ö *Id.* For this reason, ö[t]he Government's convenience is . . . a factor given little weight when other considerations of convenience suggest transfer of a trial under Rule 21(b).ö *United States v. Gruberg*, 493 F.Supp. 234, 243 (S.D.N.Y. 1979) (*citing United States v. Olen*, 183 F.Supp. 212 (S.D.N.Y. 1960)). *See also* Subsection 5, *infra,* p. 35, relating to expense of parties.

In the end, the defendant's location of residence ó recognized as the most significant factor in determining a convenience transfer by courts in the Second Circuit and also by many federal circuit and district courts across the country, as well as by the Supreme Court itself -- weighs decidedly in favor of transferring Mr. Alshdaifat's trial to the Eastern District of Michigan.

2.   Mr. Alshdaifat's Witnesses Reside and Work in the Detroit Metropolitan Area and Government Agent Witnesses Are Also Stationed in Detroit

The second *Platt* factor instructs this Court to consider the location of possible trial witnesses.

As stated in the Factual Background section *supra*, the core evidence in this case comes in the form of documentary evidence ó evidence of what declarations were made on shipping labels, invoices, and Customs paperwork, and what was said in emails between and among the defendants. All of this evidence can be introduced through business or government custodians, and its admission likely will not even require live witnesses, because at least the defense would be willing to enter into stipulations or receive certifications of the documents in advance to authenticate the documents as business records. *See* Fed. R. Evid. 902(11).

The large majority of government witnesses will clearly be government agents ó officers and inspectors within ICE and CBP, and the ICE case agents. It is not clear at this point whether these agent and inspector witnesses are stationed in New York. Because the importation

shipments at issue in this case were not confiscated by Customs at the time of their entry in the United States (except for the sea cargo shipment charged in Count 7, but Mr. Alshdaifat is not charged in that count), there are no relevant witnesses to Customs seizures at New York ports-of-entry.  Most of the Egyptian items were seized at co-defendants' residences during the execution of search warrants.

The government apparently has two main case agents from ICE who have taken the lead in this investigation.  They each have sworn to a series of search warrant affidavits that have led to the seizure of most of the government's evidence in this case.  One of these agents is a Detroit ICE Special Agent named Pietro Ciranni.  As stated in the sections above, he already testified in these proceedings against Mr. Alshdaifat at his detention hearing in the Eastern District of Michigan.

Clearly, S.A. Ciranni is a chief government witness at Mr. Alshdaifat's trial, and he and his staff are located in Detroit.  Agent Ciranni has been involved in the investigation of Mr. Alshdaifat for over at least the past year.  In December 2010, Agent Ciranni oversaw Customs' seizure of ancient coins that Mr. Alshdaifat was importing into the United States by hand on an international flight arriving at Detroit Metropolitan Airport. (*See* Administrative Detention Notice, 12/22/2010, at Ex. F.)  The government has informed the defense that it might seek to introduce events that transpired at the airport and afterward as "other act" evidence at Mr. Alshdaifat's trial.  Agent Ciranni also interviewed Mr. Alshdaifat after the detention of his coins at the Detroit Airport. (*See* Ciranni Report of Interview, 1/10/2011, at Ex. G.)

Agent Ciranni also executed the arrest of Mr. Alshdaifat on July 13, 2011. (*See* Ciranni Report of Interview, 8/30/2011, at Ex. H.)  He oversaw the search of Mr. Alshdaifat's house at that time. (*Id.*)  He was present with nearly a dozen other agents, all or most of whom are

26

presumably from Detroit and are possible witnesses if the government seeks to introduce
evidence taken from Mr. Alshdaifat's house.  Also, Agent Ciranni interrogated Mr. Alshdaifat at
length after his arrest. (*Id.*)  Again, the government is likely to introduce those statements
through Ciranni or a witness to that interview in Detroit.

Even if there are government agents who will be called at Mr. Alshdaifat's trial who are
not stationed in Detroit, this fact should bear little significance in analyzing the *Platt* factors.  At
least one district court has instructed that "government-employee witnesses, like the government
lawyers, have nationwide responsibilities and are equipped to operate away from home with
minimal disruption of their official business." *Benjamin*, 623 F.Supp. at 1213.[8]

As to non-government fact witnesses relevant to Mr. Alshdaifat's business and financial
dealings, these are either located in Detroit or the Middle East.  Obviously, the latter would be no
less inconvenienced by a trial in either Detroit or Brooklyn.  As explained above, Mr. Alshdaifat
operated his business out of his home in Orchard Lake, Michigan.  International coin or artifact
shipments to Mr. Alshdaifat's business were largely received in Michigan; he conducted his
banking in Michigan (which may be relevant to Count 2, the money laundering conspiracy
count); and to the extent he communicated to the government or alleged co-defendants, he did so
from Michigan.  Mr. Alshdaifat employed the services of a Customs broker agency in Detroit to
assist him in completing the necessary paperwork to properly declare importation shipments into
the United States.  This company's employees may be called as fact witnesses at trial.  Of course,
they live and work in Detroit.

---

[8]       In addition, even if the government claims that its lead case agent, ICE S.A. Brenton
Easter has his office in New York, this fact is of little moment.  The Court can take judicial
notice that the prosecution's case agent's job requires him to testify in criminal prosecutions.
*See United States v. Green*, 983 F.2d 100, 103 (8th Cir. 1992).  Thus, because testifying is part of
his job, there would be no personal inconvenience in his having to travel to Detroit to testify in
this case, if needed.

Mr. Alshdaifat also personally sought the advice and guidance of CBP inspectors in Detroit before he imported antiquities.  These government inspectors, on whose advice he relied, are located in Detroit.  Accordingly, the majority of fact witnesses relevant to a trial against Mr. Alshdaifat hail from the Detroit metropolitan area. *See Ferguson*, 432 F.Supp. 2d at 564 (location of witnesses is ōone of the most significant factors in the decision to transfer venue under Rule 21(b)ö) (internal quotation marks and citations omitted).

 Furthermore, Mr. Alshdaifat expects to call several character witnesses on his behalf, all of whom are located in the Detroit area.[9]  The ability to present character witnesses is critical to Mr. Alshdaifatøs defense.  He is charged with specific intent crimes so his *mens rea* is a critical element of the governmentøs proof at trial, and Mr. Alshdaifatøs general character for law-abidingness and truthfulness will be highly relevant.  The *Russell* court instructed:

> Since this case involves allegations of fraud, the *mens rea* of the defendants and their general character will be of some consequence.  Even if, as is likely, not all of the character witnesses will ultimately testify, the ability of the Russells to call them will be much less, and the cost much more, if the case is tried in New York rather than Memphis.  The availability and convenience of these witnesses, while not a controlling factor, is one that should be given considerable weight, *see, e.g., United States v. Haley*, 504 F.Supp. 1124, 1127-28 (E.D. Pa. 1981), and in this instance that factor favors transfer.

*Russell*, 582 F.Supp. at 663.

Because most of the individuals whom Mr. Alshdaifat would seek to call as witnesses are from Detroit, there can be no comparison between the impact on their lives, businesses, and daily

---

[9]     Mr. Alshdaifat seeks leave in this motion to submit *ex parte* and *in camera* a list of potential witnesses he intends to call at trial.  Because the defense strategy is still being developed at this early stage of receiving and reviewing discovery, Mr. Alshdaifat respectfully seeks to reveal this information at this time only for purposes of this motion.  Of course, he will abide by his reciprocal discovery obligations and produce to the government all that is required under the Federal Rules of Criminal Procedure.

routines if they were subpoenaed to testify in Brooklyn as opposed to being called to testify a

short distance away in Michigan.  Some of Mr. Alshdaifat's character witnesses are academics,

who unless the trial is held in the summer months, may be forced to miss classes.  Testimony at

trial in Brooklyn would mean taking at least two days – and maybe three depending on the

nuances of trial – away from their families and businesses.  The Court, of course, cannot

reimburse witnesses for lost income during this period, and at least for those who have teaching

responsibilities, their students also would be affected by the cancellation or postponement of

lectures.  *See United States v. Hurwitz*, 573 F.Supp. 547, 552, n. 16 (S.D.W.Va. 1983) ("The

Court cannot underestimate the importance of these [character] witnesses to the Defendants and

of the greater likelihood that the Defendants will in fact be able to produce such witnesses to

testify if the trial of this action is held in [the district of the defendant's home and business]").

The fact that these witnesses' testimony would be brief is just another element that highlights the

burden of producing them in a distant court.  *See e.g., United States v. Lima*, No. 94 Cr. 800,

1995 WL 348105, at *3 (N.D. Ill. June 1, 1995) (Williams, J.) ("It makes more sense to fly one

Chicago witness to New Jersey to testify for five days than to fly eight New Jersey witnesses to

Chicago to testify for a few hours.").

      Trying the case in Brooklyn rather than Detroit will affect not only Mr. Alshdaifat's

character witnesses' willingness to appear, but also the weight given their testimony.  *See

Johnson*, 323 U.S. at 279 (Murphy, J., concurring) ("Very often the difference between liberty

and imprisonment in cases where the direct evidence offered by the government and the

defendant is evenly balanced depends upon the presence of character witnesses" and "they are

likely to lose much effectiveness before a distant jury that knows nothing of their reputations");

*Layne*, 2005 WL 1009765, at *10 ("As courts have recognized, the impact of character witnesses

is generally greater in the district where such witnesses live and work.ö) (internal quotation marks and citations omitted); *Martino*, 2000 WL 1843233, at *6 (same); *see also Ohran*, 2000 WL 620217, at *3 (granting transfer to Florida and stating õthe impact of [character witnessesø] testimony on a jury would be greater in Florida where they live and work.ö).  Depriving Mr. Alshdaifat of the availability of his character witnesses, who may be reluctant or even unable to travel to Brooklyn, and whose testimony may not be given their due weight because of their status as outsiders, may affect his ability to present his defense.  Such a result would clearly be contrary to the õinterests of justiceö contemplated in Rule 21(b).

Finally, as the court emphasized in *Clark*, õthe convenience factor should relate not only to the calling of witnesses, but to the process of interviewing and determining which witnesses should be called.ö *United States v. Clark*, 360 F.Supp. 936, 943 (S.D.N.Y. 1973).  Here, the lionøs share of Mr. Alshdaifatøs prospective witnesses with relevant testimony to offer are in Detroit.  It will add extensive costs, in both time and money, for New York counsel to investigate these witnesses in Detroit.[10]

In addition, it is well-known that, in view of the limited federal criminal discovery requirements imposed on the government (particularly with respect to witness statements), defense counsel often cannot fully anticipate what witnesses will be needed until the government begins presenting its case (or produces Section 3500 material on the eve of trial).  *See Benjamin*, 623 F.Supp at 1214.  If the case against Mr. Alshdaifat proceeds to trial in Brooklyn, defense counsel will essentially lose any ability to speak with witnesses in Detroit to investigate

---

[10]    Considerations such as these prompted the court in *Clark* to order the transfer of ***five of eight*** defendants charged in a securities fraud scheme from New York to Oklahoma.  Judge Griesa noted that where these defendants and almost all of their witnesses resided in Oklahoma, forcing these defendants to go to trial in New York with New York counsel necessarily presented the defense with õsevere and unwarranted obstacles.ö *Clark*, 360 F.Supp. at 944.

government witness claims, or to develop additional witnesses to meet and answer these claims. Mr. Alshdaifat did not conduct his importation business with people in New York, and especially did not consult with others about how to make Customs disclosures in New York – he always made those inquiries and prepared his documentation in Detroit.

In sum, as to the first two particularly important *Platt* factors, the following considerations weigh heavily in favor of transfer: (1) the substantial familial and financial burden to Mr. Alshdaifat of holding the trial in Brooklyn; (2) the fact that witnesses to Mr. Alshdaifat's business activities and character witnesses are located in the Detroit area; (3) the significant cost and inconvenience of flying and housing all of the defense witnesses in Brooklyn; and (4) and indeed the potential undermining of Mr. Alshdaifat's ability to use character witnesses by forcing them to travel and testify before distant juries.

3. <u>The Events in This Case Are Not Centralized in a Single Location and the Location of Documents is of Little Consequence Because of Electronic Case Management</u>

The third and fourth *Platt* factors include the location of the events at issue and the location of documents and records likely to be involved at trial. As stated in the Factual Background section, *supra*, there is no single situs of events charged in the Indictment. The defendants all resided or operated businesses in different locations, including Michigan (Alshdaifat), New York (Khouli), Virginia (Lewis), and the U.A.E. (Ramadan). The record of transactions involving the importation of the Egyptian sarcophagi is comprised largely of emails. As such, there is no central location where several acts by the defendants took place.

Based on the Indictment, it appears that the only "acts" that took place in the Eastern District of New York were the arrival of some international mail or air cargo shipments into Kennedy International Airport; not any specific action taken by any of the defendants within this district. (*See* Indictment, Overt Acts, ¶¶16a-e (claiming acts of wiring of money and sending

31

correspondence – by email – between or among defendants)).  Therefore, this case does not have a central "hub" of events that make any specific district – the Southern or Eastern Districts of New York, the Eastern District of Michigan, or the Eastern District of Virginia – a more preferred choice. *See United States v. Donato*, 866 F.Supp. 288, 293 (W.D. Va. 1994) (granting transfer and noting "the court should consider the locus of criminal activity charged in the count the defendant seeks to transfer and the significance of any criminal acts committed in the various districts where venue exists").

However, the locus of the charged conduct as to Mr. Alshdaifat is clearly within the Eastern District of Michigan.  The government asserts in the Indictment that he operated his business out of his home in the Eastern District of Michigan. (Indictment, ¶ 6.)  To the extent that the government identified Mr. Alshdaifat's role in the charged conspiracy, he is alleged to have operated as a broker between the source of the Egyptian artifacts (defendant Ramadan) and the antiquities dealer who imported them (defendant Khouli).  There is no evidence in discovery that shows Mr. Alshdaifat, in his presumed capacity as a middleman, took any actions in support of the preparation, documentation or execution of the importation of the Egyptian objects.  The evidence only shows that Mr. Alshdaifat routinely conducted business transactions from his home.  It further shows that he conducted financial transactions from banks within the Eastern District of Michigan.  There is no evidence that Mr. Alshdaifat – or any of the other defendants for that matter – took any action within the Eastern District of New York in furtherance of the alleged importation scheme (except for defendant Khouli's hiring of a Customs broker in Queens to handle the shipment charged in Count 7, a transaction for which Mr. Alshdaifat was not involved and is not charged).

32

In sum, because the events charged in the Indictment were alleged to have been conducted by the defendants in disparate locations and largely by distant correspondence, there is no single "hub" or central location of the charged activities. However, because **Mr. Alshdaifat's** conduct was centrally located in the Eastern District of Michigan, to the extent that this factor has any significance to the parties, it favors trial in that district.

Finally, the fourth *Platt* factor, the location of the relevant documents is of little consequence one way or the other. Although the documents likely to be used at trial have been amassed by the government in Brooklyn, this is not a major concern in today's era of electronic media and the parties' ability to reduce documents to files on compact discs and flash drives. *See e.g., United States v. Posner*, 549 F.Supp. 475, 478 (S.D.N.Y. 1982) (finding five file drawers "readily transportable").

4. Mr. Alshdaifat's Business Has Been Severely Disrupted by His Arrest and Indictment, and His Wife's Job, Which Has Become the Only Stable Source of Family Income, Will be Jeopardized if this Case Continues to be Adjudicated in Brooklyn

The fifth *Platt* factor is the disruptive effect that a distant district's prosecution will have on an out-of-district defendant's business. *See United States v. Aronoff*, 463 F.Supp. 454, 459 (S.D.N.Y. 1978) (disputing government's assertion that "a trial anywhere" will disrupt business because "even a few hours each weekday plus weekends [at work] could make a substantial difference").

In this case, as explained at length above, Mr. Alshdaifat's numismatics business was temporarily shut down by the government's seizure of his entire inventory as part of an over-zealous search of his home at the time of his arrest. While the government has since returned Mr. Alshdaifat's coins to him – more than two months later – his business continues to suffer the effects of that seizure and the news of his arrest. (*See* Alshdaifat Decl., ¶ 20.) Because he has

33

been suspended from participating in the auction houses which function as his business's marketplace and kicked out of the banks where his business did its banking, his business income has been substantially curtailed. (*Id.* at ¶¶ 18-19.)  He continues to attempt to revive his business and banking relations, all from the confines of his home -- while on strict home detention as a condition of bail. (*Id.* at ¶ 17.)

Mr. Alshdaifat's business has been severely diminished by the government's accusations and overbroad search and seizure of his inventory.  Because ICE reported in public statements, such as press releases and in interviews with mass media, that they successfully had "recovered" Mr. Alshdaifat's inventory of ancient coins in his home, his customers have shunned his efforts to re-introduce these coins in the marketplace. (*Id.* at ¶ 20.)  Importantly, the auction houses themselves still refuse Mr. Alshdaifat access to their sites. (*Id.*)

In addition, the government's physical mishandling of Mr. Alshdaifat's coin inventory caused significant damage to the coins it returned.  The government treated the coins as any other type of evidence it might seize and dumped large quantities of coins -- mixing gold, silver and bronze ancient coins -- into large, plastic evidence storage bags, which were later sealed. (*See* Defendant Alshdaifat's Motion to Inspect Property, ECF Dkt. No. 33, Aug. 17, 2011; and Alshdaifat Decl., ¶¶ 21-22.)  As a result, Mr. Alshdaifat lost significant value in many of these coins due to a downgrade in their condition. (*Id.*)  Also, he now needs to spend considerable time to clean and remove the acidic "disease" which had infected the coins while they were stored in the sealed plastic bags. (*Id.* at ¶ 22.)

Mr. Alshdaifat operates his business by himself, without the aid of any employees (which he particularly cannot afford now due to the business damage inflicted by the government's arrest). (*Id.* at ¶ 23.)  The cleaning process, therefore, is painstakingly slow.  It requires that

coins individually be placed in chemical solvents for long periods of time to stop the corrosion and remove any infection that soiled the coins. (*Id.*)  This process also requires the physical space to spread the coins out individually. (*Id.* at ¶ 24.)  Mr. Alshdaifat has dedicated space throughout his house (particularly in a completed basement) to perform this process. (*Id.*)  If he must travel and reside in New York for extended periods to prepare for trial, this will only prolong and possibly retard the cleaning and revitalization process essential to his business revival.

More urgently, this *Platt* factor should not be evaluated exclusively on the effect of a distant prosecution on the defendant's business alone, especially in a case where the defendant's familial obligations have changed so drastically as a direct result of these charges.  Here, Mr. Alshdaifat's family has come to rely financially on the income of his wife, who holds a full-time job for the Canadian government.  Because Ms. Butera works on salary and does not have considerable flexibility in her schedule, if Mr. Alshdaifat were required to travel regularly to New York to prepare his defense and attend court hearings and trial, this would place an enormous strain on Ms. Butera's ability to regularly report for work. (*See* Butera Decl., ¶¶ 6-7.)  Because the family currently has limited child care options, Mr. Alshdaifat's availability to care for his children is necessary to ensure that Ms. Butera can continue to work.  If Ms. Butera lost her job due to increased absences from work, the family would find itself in dire financial straits. (*Id.* at ¶ 8.)  This reason alone should be sufficient to transfer the case against Mr. Alshdaifat to Detroit.

5. **On Balance, the Cost Impact on Mr. Alshdaifat of Trying This Case in Brooklyn Outweighs the Marginal Costs to the Government of a Potential Second Trial in Detroit**

The sixth *Platt* factor, expense to the parties, also weighs in favor of transfer of Mr. Alshdaifat's case to the Eastern District of Michigan. As illustrated above, the Alshdaifat family does not have substantial funds at their disposal to meet: (1) family expenses, including child care for their four children, (2) payments for legal services, (3) payments for travel and lodging expenses for Mr. Alshdaifat to come to New York to meet with his attorney, prepare his defense and attend court, (4) payments for travel and lodging for his family during trial, so that someone can be in court with him to give and show support, and (5) payments for travel and lodging of defense witnesses. *Ferguson*, 432 F.Supp.2d at 657 ("Travel and lodging expenses are an obvious factor to be considered in determining the balance of inconvenience to the parties") (*citing United States v. Haley*, 504 F.Supp. at 1128-29).

While it is true that the government also will bear costs of travel if Mr. Alshdaifat's case is transferred to Detroit, and Rule 21(b) speaks to the convenience of the "parties" and not just the defendant, this is a less compelling factor than the costs to Mr. Alshdaifat of financing a trial in a place more than 600 miles from his home and business. As the *Ferguson* court noted, "the United States of America has, for all practical purposes, unlimited resources to bring to bear." *Ferguson*, 432 F.Supp.2d at 567. In *Ferguson*, the Court held that the defendants' resources – which were considerable given their corporate positions and the availability of insurance policies to pay for most legal expenses – still paled in comparison to the government's and the government was in a better position to bear the additional expense of trying the case in the defendants' place of residence and business. *Id.* Here, as explained above, the calculus is even

36

more extreme because Mr. Alshdaifat was not the corporate executive of a major public company and does not have insurance proceeds to fall back on.  His company is currently producing little income and Mr. Alshdaifat is fighting to prevent the business from failing entirely.  He has four young daughters under the age of ten, and now relies on the salary of his wife to meet basic family needs.  *See also Layne*, 2005 WL 1009765, at *5 (S.D.N.Y. May 2, 2005) (granting transfer motion to avoid õa substantially larger financial burden on the Defendantsö); *Martino*, 2000 WL 1843233, at *7 (finding that õthe government is in a better position to bear such an expenseö); *McDonald*, 740 F.Supp. at 763 (transferring venue and rejecting governmentøs argument regarding financial burden).

Continuing these proceedings in the Eastern District of New York will force Mr. Alshdaifat to come to New York on a regular basis as trial approaches to assist his counsel in preparing a defense.  He will need to review documents ó consisting of tens of thousands of emails, financial records, and other documentary evidence ó with defense counsel.  He will have to find a way to pay the expense of travel from his home in Orchard Lake, Michigan to and from New York.  He will have to find a way to pay the expense of lodging in New York in addition to the upkeep of his mortgage at home.[11]  As emphasized above, his travel to New York likely will also incur the expense of child care at home so that his wife does not lose her job.  Taking these personal and financial factors into consideration, there can be no doubt that the anticipated

---

[11]    For example, considering the cost of lodging and airfare alone, the Marriott Hotel in downtown Brooklyn currently advertises standard rooms for approximately $250.00 to $429.00 per night depending on the date.  *See* www.marriott.com/reservation/availabilitycalendar/nycbk-new-york-marriott-availability.  Also, Expedia.com advertises more than two-week advanced booking round-trip airfare from Detroit to New York at approximately $350 to $500.  Less than two-week advanced booking for the same round-trip airfare ranges from over $800 to $1250.  Mr. Alshdaifat reported that his two brief trips to New York in August to meet with his attorney and attend court cost him approximately $2,000.00. (*See* Alshdaifat Decl., ¶ 37.)

expense associated with defense preparation and trial[12] of this matter weighs in favor of a transfer to federal court in Detroit.

The fact that Mr. Alshdaifat's request here would naturally result in the government having to prosecute two cases in multiple forums does not change this result.  Indeed, the plain language of Rule 21(b) expresses Congress' intent to allow for transfers that sever defendants and create multiple cases for the government to try:  "the court upon motion of the defendant may transfer the proceeding *as to that defendant* or any one or more counts thereof to another district." Fed. R. Crim. P. 21(b) (emphasis added).

In accordance with the express language of the Rule, courts have long granted motions that apply to only some of the defendants in a case. *See, e.g., United States v. Choate*, 276 F.2d 724, 726, 729 (5th Cir. 1960) (five of seven defendants were transferred for trial from Miami to Birmingham); *United States v. Bein*, 539 Supp. 72 (N.D. Ill. 1982) (court granted motion to transfer trial of three of seven defendants from Chicago to New York); *United States v. Barrientos*, 485 F.Supp. 789, 789-90 (E.D. Pa. 1980) (transfer from Philadelphia to Miami granted for two of four defendants); *Aronoff*, 463 F.Supp. at 459-60 (granting motion to transfer as to one of three defendants); *United States v. Clark*, 360 F.Supp. at 945-46 (trial of five defendants transferred to Oklahoma City, while trial of three others remained in New York); *United States v. Jessup*, 38 F.R.D. 42, 47-48 (M.D. Tenn. 1965) (two of three defendants transferred from Nashville to Southern District of Mississippi for trial); *United States v. Erie*

---

[12]     The government has yet to provide an expected timeframe for presenting its case at trial. However, if all three currently charged and arraigned defendants proceed to trial on the nine counts in the Indictment, it can hardly be expected that this case can be tried in less than four weeks, and likely a week or two longer, given the government's current plan to introduce multiple expert witnesses and the possibility that the defense will counter with its own experts.

*Basin Metal Products Co.*, 79 F.Supp. 880, 885-86 (D. Md. 1948) (four of six defendants were transferred from Baltimore to the Northern District of Illinois for trial).

Mr. Alshdaifat concedes that transferring his case would undoubtedly create additional expense for the government (if both sets of defendants continued on to trial, which statistically speaking is not an overwhelming possibility). This fact alone, however, does not shift the balance of this factor against transfer of Mr. Alshdaifat's case.

First, as explained above, the government's case is largely based on documentary evidence and the testimony of law enforcement officers, who are located both in New York and Detroit. Requiring case agents to testify in two different cities is much different than asking lay witnesses to travel to two locations and testify twice. This case largely involves the former. Moreover, it is very possible that the government can rely solely on the testimony of its ICE agents stationed in Detroit, including co-lead ICE agent Pietro Ciranni, rather than having to send agents from New York to testify at Mr. Alshdaifat's trial.

Secondly, any trial against Mr. Alshdaifat would be much shorter in duration than that of his co-defendants. Mr. Alshdaifat is charged in only five of nine counts in the Indictment. The three substantive smuggling counts charged against him, alleging violations of 18 U.S.C. § 545 (Counts 4-6), largely involve several informal international mail shipments that did not implicate third-party witnesses such as private Customs brokers or employees or other lay witnesses who acted to prepare the shipment and importation documents (in contrast, for example, to Count 7, which involved a sea cargo shipment that passed through a private shipping company and the use of a Queens Customs brokerage firm). In fact, because the bulk of the charged shipments against Mr. Alshdaifat were simply placed in the mail, no private carriers were involved at all. Thus, the

39

universe of witnesses who could be involved in the mailing process is limited to the exporter and importer -- both charged defendants in this case.

The government's position in support of criminal liability on the charged air mail shipments is based largely on the claim that Mr. Alshdaifat's co-defendants put these pieces in international mail or on an airplane as air cargo without completing more formal U.S. Customs paperwork with the specific intent to avoid Customs' detection of these shipments and break U.S. Customs' law.  No lay witnesses exist to testify as to whether a defendant's act of putting these parcels in the mail or on an airplane constituted an intentional and clandestine conspiratorial effort to get the charged, *legal* merchandise[13] into the United States.  Because these witnesses do not exist, the government will not incur added cost in time or money of having to get lay witnesses from New York to testify at two trials, one of which will be in Detroit.  The government instead apparently seeks to show the defendants' required intent of breaking Customs law by introducing expert witnesses about the typical Customs process and the existence of so-called patrimony, or title-vesting laws in Egypt which protect newly unearthed antiquities from leaving Egypt.  (*See* Gov. Discovery Letter, 8/11/2011, ECF Dkt. No. 30.)  This testimony may be inadmissible as an improper use of expert testimony.  *See United States v. Dukagjini*, 326 F.3d 45, 53 (2d Cir. 2003) (government's use of agents to testify about specific disputed fact matters "increase[d] the likelihood that inadmissible and prejudicial testimony [would] be proffered") and *United States v. Mejia,* 545 F.3d 179, 198-200 (2d Cir. 2008)

---

[13]     The government does not charge that the Egyptian coffins and funerary objects were stolen property.  The objects imported, therefore, are not contraband or unlawful to possess in the United States.  The government's claims in this Indictment rest instead on the precarious theory that the *method* in which the artifacts were shipped into the United States was intentionally fraudulent even though the goods themselves were not banned or prohibited from entry.  Indeed, the government does not even claim that the method of importation was intentionally fraudulent to avoid import duties, since antiquities are excluded from any import tax.

(reversing convictions based on erroneous admission of so-called expert testimony that relied on out-of-court statements heard during course of investigation and not applying any particular expertise).

In any event, Mr. Alshdaifat is not even implicated in the government's discovery with doing anything ó in New York or elsewhere ó to assist in the importation of the merchandise.  He is charged with putting the alleged source of the Egyptian coffins and artifacts (defendant Ramadan) in contact with the New York antiquities dealer who purchased them (defendant Khouli).  The government must concede that Mr. Alshdaifat was neither the importer nor exporter of the charged shipments, and therefore had no role in the actual shipment of the merchandise, *i.e.,* the packaging, labeling and placing of the merchandise in international mail.  As such, he never had any contacts with New York.

As to the money laundering conspiracy charged in Count Two, this count is derived entirely from the financial transactions conducted to pay for the allegedly improperly imported merchandise, including some wire transfers form banks in the United States to banks outside of the country that were made as payment for the goods.  Except for bank personnel to authenticate bank records, this count also is likely not to involve lay witnesses from New York, and it is likely that the parties could reach a stipulation to avoid any live testimony from bank custodians at all.

At a trial, therefore, against Mr. Alshdaifat, the government likely would call fewer than ten total government witnesses, and far fewer ó if any ó from New York, and to the extent that a government agent may need to travel from New York to Detroit, as explained earlier, this fact poses little hardship to the government.  *See United States v. Robinson,* No. 09-0031, 2010 WL 3087446, at *5 (D. N. Ma. I., July 29, 2010) (Bennett, J.) (in granting defendantøs Rule 21(b)

41

motion, giving little weight to government agents' inconvenience of traveling to transferee

district, stating "because testifying is part of [their] job, the court finds that the case agent would

not be greatly inconvenienced in having to travel to [the transferee district] to testify in this

case," which meant travel in that case from the Northern Mariana Islands to Washington, D.C., a

distance far greater than New York to Detroit).

Thirdly, with regard to the inconvenience and cost of having a government prosecutor

from Brooklyn come to Detroit to try the case against Mr. Alshdaifat, this expense pales in

comparison to the costs (emotionally, financially, and from family obligations) outlined above

that Mr. Alshdaifat would bear if forced to defend himself in Brooklyn.  As the *Benjamin* court

cogently explained:

> The United States is ubiquitous.  The [federal investigating
> agencies] and the Department of Justice are, or should be, "at
> home," not only in [their regular office], but also in . . . any other
> place . . . in which a federal court sits. . . .  In any federal district,
> the government lawyers have a built-in office, complete with local
> logistical support from parallel local staffs of the U.S. Attorney
> [and other law enforcement agencies]. . .  The Justice Department
> is, or should be staffed, so that if one prosecuting team is away
> from [their home office], supervisors and other lawyers can carry
> on for them in any other matters for which they are responsible.

*Benjamin*, 623 F.Supp. at 1212.  *See also Gruber*g, 493 F.Supp. at 243 ("The Government's

convenience is, however, a factor given little weight when other considerations of convenience

suggest transfer of a trial under Rule 21(b)"); *Aronoff*, 463 F.Supp. at 460 (in complex real estate

fraud case, granting one defendant's Rule 21(b) motion and denying a second defendant's

motion, finding that the relevant question was "whether the moving defendant ha[d] made

enough of a showing of hardship to outweigh the government's strong interest in conducting one

trial at the place most convenient to itself and its witnesses," and concluding that denying the

motion to defendant Robinson would "cause the defendant to do without the support of his

family, friends, and even his chosen counsel, to have his business severely disrupted and cause

great inconvenience to his witnesses, which on balance were greater hardships than the

government's).

Moreover, where – as appears to be the case here – the U.S. Attorney's Office in the

proposed transferee district in Detroit "already has substantial familiarity" with Mr. Alshdaifat

and his issues in this case, the cost to the government is even further minimized. *Russell*, 582

F.Supp. at 664 (in calculating Rule 21(b) balance of hardships, considered fact that prosecutors

in proposed transferee district already had dealt with issues involving the defendants seeking

transfer, and concluded that it would be "no great problem" to move the prosecution team from

the transferor district or pass the case on to another set of prosecutors with knowledge of the

case). In this case, a federal prosecutor from the Eastern District of Michigan, Assistant U.S.

Attorney Sara Woodward, already prepared for and litigated a two-day evidentiary detention

hearing against Mr. Alshdaifat that dealt with details of the facts charged in the Indictment. (*See*

*United States v. Alshdaifat*, No. 11-30365 (E.D. Mi. July 14-15, 2011) (filed electronically on

Pacer). It would not be difficult for Ms. Woodward to get up to speed with the evidence in this

investigation, and working together with ICE Special Agent Ciranni in Detroit, prepare the case

for trial.

In light of all of these considerations, this factor weighs in favor of transferring Mr.

Alshdaifat's case to the Eastern District of Michigan.

6.   <u>None of the Remaining *Platt* Factors Weigh Against Transfer to the Eastern District
     of Michigan and, to the Extent Relevant, They Slightly Favor Transfer</u>

The remaining *Platt* factors are relatively neutral or weigh slightly in favor of transfer.

The last three enumerated *Platt* factors are:  (1) location of counsel; (2) relative accessibility of

the place of trial; and (3) the docket condition of each district involved.

First, with respect to the location of counsel, all counsel are currently located in New York.  But, it will no doubt be less expensive for Mr. Alshdaifat to retain counsel in Detroit if the case is transferred there.  *See Ohran*, 2000 WL 620217, at *4 (finding that transferring case in early stage of proceedings would allow the defendant to retain new counsel in Florida at rates predictably lower than New York counsel).  In fact, Mr. Alshdaifat already retained criminal counsel in Detroit to represent him at his detention hearing there.  Thus, he has counsel of his choice in Detroit, who is familiar with the charges and some of the facts at issue.  Returning the case to Detroit counsel would be a seamless transition especially at this early stage of the proceedings.  The government is still producing discovery and no pretrial motion schedule, let alone trial date, has yet been set. *See Clark*, 360 F.Supp. at 944 (describing "the ability or inability of the parties to handle th[e] case effectively and economically" as "[p]erhaps the ultimate consideration").

Finally, the two remaining *Platt* factors – the accessibility of the place of trial and the dockets of the courts involved – are of either neutral value or weigh in favor of transfer.  Detroit and Brooklyn are large metropolitan areas that are easily accessible by air travel or otherwise.

As to the docket conditions in the two district courts, according to the most recent statistics compiled by the United States Courts, Office of Court Administration, the per judgeship criminal filings in the Eastern District of Michigan for cases filed to date in 2011 is 41, while for the same time period in the Eastern District of New York, there have been 59 criminal cases filed per judgeship. *See* www.uscourts.gov/statistics/federalcourtmanagementstatistics.aspx (printed spreadsheets from Office of Court Administration website, at Ex. I).  The Eastern District of Michigan has a median time of 10.3 months from filing to disposition of a criminal felony case, whereas the Eastern District of New York has a median time of 16.2 months. *Id.*  In

44

2011, to date, there have been 604 criminal cases filed in the Eastern District of Michigan, and 880 criminal cases filed in the Eastern District of New York. *Id.* Court statistics, therefore, show a more favorable docket in the Eastern District of Michigan, which would weigh in favor of transfer.

7. "Special Elements" Weigh In Favor of Transfer to Michigan

There are also *Platt* "special elements" that support transfer of this case to the Eastern District of Michigan. Specifically, these include: (1) in connection with the criminal investigation that led to the charges in this Indictment, the government has also initiated multiple administrative seizure actions against Mr. Alshdaifat's business merchandise, and three of these remaining outstanding property seizures occurred within the Eastern District of Michigan (two imported mail shipments of coins, which were voluntarily produced by Mr. Alshdaifat to ICE Agent Ciranni in Detroit, and one outgoing Federal Express package that was seized in Detroit). The transfer of the criminal case to the location of these other civil matters will help Mr. Alshdaifat to conserve resources in litigating all of the government's actions against him; and (2) Mr. Alshdaifat has been diagnosed with chronic migraine headaches and a deteriorating knee injury that might require imminent surgery. His treating physician, Dr. Rashid Alsabeh, has advised him to manage his stress levels and extensive travel alone and time away from his family under obviously extremely stressful conditions could trigger an outbreak of this condition. (*See* Alshdaifat Decl., ¶ 40, and Medical Records, at Ex. E.) Mr. Alshdaifat also recently has been diagnosed with a deteriorating knee condition (a "degenerative tear of the medial meniscus" and "loose bodies" in his left knee) that might require imminent knee reconstruction surgery. (*Id.*, at ¶ 41.) Of course, the effects of major knee surgery also will make extensive air travel difficult and painful for Mr. Alshdaifat in the several months following surgery.

45

## <u>CONCLUSION</u>

As set forth above, the large majority of *Platt* factors weigh heavily in favor of a transfer of Mr. Alshdaifat's case to the Eastern District of Michigan.  Accordingly, for the convenience and fairness to the parties and witnesses and in the overall interests of justice, Mr. Alshdaifat respectfully requests an Order transferring this action to the United States District Court for the Eastern District of Michigan.

Dated: New York, New York                    Respectfully submitted,
       November 21, 2011


By: _____/S/_____
       Henry E. Mazurek
       Clayman & Rosenberg LLP
       305 Madison Avenue, Suite 1301
       New York, New York 10165
       Tel. (212) 922-1080
       mazurek@clayro.com
       *Attorneys for Defendant*
       *Salem Alshdaifat*