UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,

                                 No. 11 CR 340 (ERK)

     -against-

MOUSA KHOULI, *et al.,*

            *Defendants,*

SALEM ALSHDAIFAT,

            *Defendant-Movant.*

-------------------------------------------------------- X


**MEMORANDUM OF LAW
IN SUPPORT OF
DEFENDANT SALEM ALSHDAIFAT'S
<u>OMNIBUS PRETRIAL MOTIONS</u>**


                      By:     Henry E. Mazurek
                              CLAYMAN & ROSENBERG LLP
                              305 Madison Avenue, Suite 1301
                              New York, New York 10165
                              (212) 922-1080 (Tel.)
                              (212) 949-8255 (Fax)
                              mazurek@clayro.com

                      *Attorneys for SALEM ALSHDAIFAT*

**TABLE OF CONTENTS**

Page

INTRODUCTION..................................................................................................1

ARGUMENT......................................................................................................3

Motions Challenging the Indictment

I.  THE SMUGGLING COUNTS MUST BE DISMISSED
    BECAUSE THE FEDERAL SMUGGLING STATUTE, 18 U.S.C. § 545,
    AS INTERPRETED BY THE SECOND CIRCUIT,
    IS VOID FOR VAGUENESS, AND IS VAGUE AS APPLIED
    TO MR. ALSHDAIFAT'S CHARGED CONDUCT.............................................3

        A.  The "Void for Vagueness" Legal Standard  í  í  í  í  í  í  ..í  ...í  ......4

        B.  The Current Section 545 Statute í  í  í  í  í  í  í  í  í  í  í  í  í  ...5

        C.  The Split in the Federal Circuit Courts About the
            Meaning of Section 545 í  í  í  í  í  í  í  ...í  í  í  í  í  í  ..í  .í  ..7

        D.  Because the Importation of Antique Egyptian Coffins
            Are Duty-Free, Ordinary Persons Would Not Be
            On Notice That They Could Violate the Federal
            Smuggling Statute, and Without a Deprivation
            of Property Requirement, Law Enforcement Had
            Inadequate Direction to Avoid Arbitrary Enforcement  í  í  í  í  í  .....10

II. COUNTS FOUR, FIVE AND SIX SHOULD BE DISMISSED
    BECAUSE THE EASTERN DISTRICT OF NEW YORK IS NOT
    THE PROPER VENUE FOR THESE CHARGES.............................................17

Motions to Suppress Evidence

III. THE SEARCH WARRANTS FOR MR. ALSHDAIFAT'S
     YAHOO! E-MAIL ACCOUNT WERE CONSTITUTIONALLY
     DEFECTIVE BECAUSE THEY LACKED PROBABLE CAUSE,
     WERE OVERBROAD "GENERAL WARRANTS," AND WERE
     BASED ON KNOWINGLY OR RECKLESSLY FALSE
     STATEMENTS IN THE SUPPORTING AFFIDAVIT í  í  í  í  í  í  í  í  í  20

        A.  The First E-Mail Warrant 3/29/10 Was Issued
            Without Probable Cause to Believe That Evidence
            of a Crime Would Be Found Within the Alshdaifat
            Yahoo! E-Mail Account í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  í  ..22

**TABLE OF CONTENTS (cont'd)**

Page

1.      The Legal Standard í í í í í í í í í í í í 22

2.      The Affidavit in Support of the First E-Mail Warrant
        3/29/10 Completely Failed to Show -- Let Alone By a
        "Substantial Basis" -- That a Particular Search of Mr.
        Alshdaifat's Yahoo! Personal E-Mail Account Would
        Uncover Evidence of Wrongdoing í í í í í í í ....23

3.      The First E-Mail Warrant 3/29/10 Was an
        Unconstitutionally Overbroad "General Warrant"
        Because It Sought "All Electronic Mail" in the
        Account Over a Period of 15 Months í í í í í í í ...31

4.      The "Good Faith" Exception in *Leon* Cannot
        Save the First E-Mail Warrant 3/29/10
        Because the Magistrate Was Knowingly or
        Recklessly Misled, the Application is Completely
        Lacking in Indicia of Probable Cause, and
        Is So Facially Overbroad That Reliance On It Is
        Unreasonable í í í í í í í .í í í í í í í í í .37

5.      In the Alternative, This Court Should Conduct a
        *Franks* Hearing to Test the Accuracy of Agent
        Easter's Statements in the Affidavit...................................38

B.  The Second E-Mail Warrant 1/25/11 Was Based on
    the Same Allegations Made in the First E-Mail Warrant
    Application and On Tainted Evidence Obtained From
    That Unlawful Search, and Therefore, the E-Mail
    Evidence Seized Pursuant to This Second Warrant
    Should Also Be Suppressed í í í í í í í í í í í í í í í 38

IV.  THE GOVERNMENT'S SEARCH WARRANT FOR
     MR. ALSHDAIFAT'S RESIDENCE WAS
     CONSTITUTIONALLY DEFECTIVE BECAUSE IT WAS
     BASED ON TAINTED EVIDENCE; THE NON-TAINTED
     EVIDENCE RELIED UPON IN THE AFFIDAVIT FAILED
     TO SUPPORT A PROBABLE CAUSE FINDING; THE WARRANT
     WAS IMPERMISSIBLY OVERBROAD, AND THE EXECUTING
     AGENTS' SEIZURES FAR EXCEEDED THE SCOPE OF THE
     WARRANT í í í í í í í í í í í í í í í í í í í í í í í í í .......40

**TABLE OF CONTENTS (cont'd)**

Page

A. The New Allegation in the Residence Search Warrant Affidavit
that Mr. Alshdaifat "Smuggled Ancient Coins Into the
United States" is Based on Recklessly or Intentionally False
Statements...................................................................41

B. Attachment B to the Residence Search Warrant Was
Impermissibly Overbroad.................................................44

C. The Computer Part of the Residence Search Warrant
Was Likewise Unconstitutionally Overbroad and the
Affidavit Lacked Probable Cause to Search All Electronic
Files...........................................................................46

D. Agents Who Executed the Residence Search Warrant
Disregarded the Terms of the Warrant and Seized Many
Items Beyond Its Scope, Including the Indiscriminate
Seizure of Mr. Alshdaifat's Entire Inventory of Ancient Coins....48

V. POST-ARREST STATEMENTS BY MR. ALSHDAIFAT
SHOULD BE SUPPRESSED BECAUSE THE GOVERNMENT
VIOLATED HIS FIFTH AND SIXTH AMENDMENT
RIGHTS IN CONDUCTING A CUSTODIAL POST-ARREST
INTERVIEW OF HIM AT HIS HOME OUTSIDE THE
PRESENCE OF COUNSEL, WHO ALREADY HAD
INFORMED THE INQUIRING AGENT THAT MR. ALSHDAIFAT
WAS REPRESENTED AND THAT ALL FUTURE
COMMUNICATIONS SHOULD BE WITH COUNSEL..............51

A. Mr. Alshdaifat's Fifth Amendment Rights Were Violated....52

B. Mr. Alshdaifat's Sixth Amendment Rights Were Violated....54

VI. THE COURT SHOULD COMPEL THE GOVERNMENT TO PROVIDE
EXPERT NOTICE AND NOTICE OF RULE 404(b) EVIDENCE
"IN A TIMELY FASHION" BEFORE TRIAL...................................57

VII. LEAVE TO JOIN IN APPLICABLE MOTIONS MADE BY
CO-DEFENDANT LEWIS.......................................................57

CONCLUSION..........................................................................58

# TABLE OF AUTHORITIES

## Cases

*Babb v. United States*, 218 F.2d 538 (5th Cir. 1955)……………….………5

*Boyd v. United States*, 116 U.S. 616 (1886)..................................................22

*Brown v. United States,* 422 U.S. 590 (1975)……............……………….…39

*Colorado v. Connelly*, 479 U.S. 157 (1986)........…………………………..53

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971)……….……………….…..46

*Edwards v. Arizona,* 451 U.S. 477 (1981)……............…………………..….52, 53

*Fare v. Michael C.*, 442 U.S. 707 (1979)……........…………………...………..52

*Farrell v. Burke*, 449 F.3d 470 (2d Cir. 2006)……........…………………...……16

*Franks v. Delaware*, 438 U.S. 154 (1978)……….........…………….....28, 38, 43

*Green v. Scully*, 850 F.2d 894 (2d Cir. 1988)………….........……………….....53

*Greenstreet v. County of San Bernardino*, 41 F3d. 1306 (9th Cir. 1994)……..........…….....23

*Groh v. Ramirez*, 540 U.S. 1284 (2004)……………........…………….....32, 35

*Hammerschmidt v. United States,* 265 U.S. 182 (1924)……........…………….....8

*Hill v. Colorado*, 530 U.S. 703 (2000)..........................................................…..15

*Illinois v. Gates*, 462 U.S. 213 (1983)……………........…………….....22, 23, 27, 30

*Kolender v. Lawson*, 461 U.S. 352 (1983)………........…………………...……4

*Maryland v. Garrison*, 480 U.S. 79 (1987)……….......…………………...……50

*McNally v. United States*, 483 U.S. 350 (1987)……….........……………….....4, 8, 9

*Michigan v. Harvey*, 494 U.S. 344 (1990)……….........……………………….....53

*Miranda v. Arizona*, 384 U.S. 436 (1966)……………........……………….....52

*North Carolina v. Butler*, 441 U.S. 369 (1979)……….........……………….....52

iv

*One Lot Emerald Cut Stone and One Ring v. United States*, 409 U.S. 232 (1972)í í ...10

*Pure Power Boot Camp v. Warrior Fitness Boot Camp*,
587 F.Supp.2d 548 (S.D.N.Y. 2008)í í ............í í í í í í í í í í í í ....22

*Rickert v. Sweeney*, 813 F.2d 907 (8th Cir. 1987)í í ........í í í í í í í í í í .36

*Skilling v. United States*, 130 S.Ct. 2896 (2010)í í ...............í í í í í í í 4, 7, 8, 17

*Stanford v. State of Texas*, 379 U.S. 476 (1965)í ........í í í í í í í í í í í 22

*Tague v. Louisiana*, 444 U.S. 469 (1980)í í ............í í í í í í í í í í ....52

*Texas v. Brown*, 460 U.S. 730 (1983)í í ........í í í í í í í í í í í í ...í .23

*United States v. Ahmad*, 213 F.3d 805 (4th Cir. 2000)í í ............í í í í í ...í í í 7

*United States v. Alghazouli*, 517 F.3d 1179 (9th Cir. 2008)í í ..................í í í í ...13

*United States v. Bianco*, 998 F.2d 1112 (2d Cir. 1993)í í .........í í í í í í í ..í .33

*United States v. Borello,* 766 F.2d 46 (2d Cir. 1985)í ......í í í í í í í í í ....3, 4, 9

*United States v. Buck*, 813 F.2d 588 (2d Cir. 1987)í í ........í í í í í í í í í ..33

*United States v. Cioffi*, 668 F.Supp.2d 385 (E.D.N.Y. 2009)í í í í í í í í ..33, 38

*United States v. Clark*, 638 F.3d 89 (2d Cir. 2011)í í ......í í í í í í í í í í .....22

*United States v. Comprehensive Drug Testing, Inc.*,
 579 F.3d 989 (9th Cir. 2009)í í í í í í í í ........í í í í í í í í ......34, 47

*United States v. Forrester*, 512 F.3d 500 (9th Cir. 2008)í í .........í í í í í í í .....21

*United States v. George*, 975 F.2d 72 (2d Cir. 1992)í í í í ......í í .32, 35, 36, 37, 50

*United States v. Hickey*, 16 F.Supp.2d 223 (E.D.N.Y. 1998)í í ........í í í í í í í í 23

*United States v. Jaswal*, 47 F.3d 539 (2d Cir. 1995)í í í ........í í í í í í í í .....52

*United States v.Kurfess*, 426 F.2d 1017 (7th Cir. 1970)í í .........í í í í í í í í í 7

*United States v. Lanier*, 520 U.S. 259 (1997)í í í ........í í í í í í í í í í í í ..4

*United States v. Leon*, 468 U.S. 897 (1984)í í í ........í í í í í í í í í í í í .23, 37

v

*United States v. Leary*, 846 F.2d 592 (10th Cir. 1988)……………………...…......45

*United States v. Lespier*, 601 F.2d 22 (1st Cir. 1979)………......…………………....5

*United States v. Liu*, 239 F.3d 138 (2d Cir. 2000)………........…………………….49

*United States v. Longo*, 70 F.Supp.2d 225 (W.D.N.Y. 1999)…………..…..............41

*United States v. Maxwell*, 920 F.2d 1028 (D.C. Cir. 1990)………..........…………..36

*United States v. McKee*, 220 F.2d 266 (2d Cir. 1955)……........…………....*passim*

*United States v. Menon*, 24 F.3d 550 (3d Cir. 1994)……............………….....*passim*

*United States v. Murphy*, 323 F.3d 102 (3d Cir. 2003)……………………..…............11

*United States v. Ozuna*, 129 F.Supp.2d 1345 (S.D. Fla. 2001),
*aff'd* 48 Fed. Appx. 739 (11th Cir. 2002)………………………………..................41

*United States v. Place*, 757 F.Supp.2d 60 (D. Mass. 2010)………………....................6

*United States v. Restrepo*, 890 F.Supp. 180 (E.D.N.Y. 1995)……………......................41

*United States v. Robinson*, 147 F.3d 851 (9th Cir. 1998)……........………………....7

*United States v. Roche*, 624 F.2d 6 (1st Cir. 1980)……….....……………………....36

*United States v. Wagner*, 989 F.2d 69 (2d Cir. 1993)..…………………..................29

*United States v. Williams*, 553 U.S. 285 (2008)……….......…………………..…..5

*United States v. Westover*, 511 F.2d 1154 (9th Cir. 1975)…….................…………..5

*United States v. Zavala*, 541 F.3d 562 (5th Cir. 2008)………........……………….…21

*Voss v. Bergsgaard*, 774 F.2d 402 (10th Cir. 1985)……........……………..….…36

*Wong-Sun v. United States*, 371 U.S. 471 (1963)……….............…………………..39

*Ybarra v. Illinois*, 444 U.S. 85 (1979)………......…………………………………..25

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978)……........………………………...31

### STATUTES, RULES AND REGULATIONS

18 U.S.C. § 371................................................17

18 U.S.C. § 542.............................................24, 30

18 U.S.C. § 545.........................................*passim*

18 U.S.C. § 1343...............................................31

18 U.S.C. § 1346................................................7

18 U.S.C. § 2315.............................................19

19 U.S.C. § 1593 (U.S.C., 1940 ed.).........................8

19 C.F.R. §§ 143.21, 143.23................................14

Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2701-2712....21

H.R. Rep. No. 304, 80th Cong., 1st Sess. (1947)
(reprinted in 18 U.S.C.C.A. 439, 440).........................8

## TREATISES

Wayne R. LaFave, *Search and Seizure:  A Treatise on the Fourth Amendment*
(4th ed. 2004)....................................................22

Leonard B. Sand, *et al., Modern Federal Jury Instructions*, ¶ 23.01, *et* seq.................5, 10

**INTRODUCTION**

Salem Alshdaifat is charged in five counts of a nine-count Indictment in the Eastern District of New York alleging what are essentially regulatory-based criminal charges.  Mr. Alshdaifat is charged with a conspiracy to violate 18 U.S.C. § 545, a statute creating a criminal offense generally for smuggling goods into the United States with the "intent to defraud" Customs.  He is also charged with a conspiracy to launder the proceeds received for the allegedly smuggled items, and three substantive counts of Section 545 violations.

The facts surrounding these charged criminal violations of the Customs laws arise out of the importation of Egyptian antiquities, including a three-piece set of coffins and other funerary objects.  These artifacts were allegedly shipped to the United States in several packages, variously by international air mail and by private air and sea carriers.  The government does not claim that the Egyptian artifacts were stolen or were otherwise contraband when they entered the country.  Instead, the government's charges rest on a theory that the alleged conspirators intended to defraud Customs by including incomplete, misleading or false information on shipping labels or cargo bills.

Mr. Alshdaifat was neither the U.S. importer nor the foreign exporter of the Egyptian artifacts.  Based on the government's own claims, he is alleged to have been the "finder" or middleman that put the alleged foreign source of the artifacts (defendant Ramadan) in contact with the U.S. importer, or interested antiquities dealer (defendant Khouli).  Despite being charged with a role that essentially ended prior to the importation process, Mr. Alshdaifat is charged with his co-defendants for knowingly participating in making false or intentionally misleading statements on shipping labels on various shipments of these Egyptian antiquities. The government's claims against Mr. Alshdaifat, therefore, rely on findings that he ***knew and***

*intentionally joined* a conspiracy to falsely declare the Egyptian artifacts in their shipment to the United States *after* his role in being a broker to the transactions was already completed.

Mr. Alshdaifat owns a business called Holyland Numismatics, which he has operated out of his home in Orchard Lake, Michigan since about June 2009.  He is principally a trader of ancient coins with a specialty in ancient Judaean coins.  He learned his profession since childhood in his native Jordan and has become an expert in reading and identifying these coins. Mr. Alshdaifat has purchased ancient coins before from defendant Ramadan in the United Arab Emirates ("U.A.E."), and has sold coins to defendant Khouli in New York.  That is how he knew two of the other parties charged in this Indictment.

In the Egyptian coffin transactions, however, Mr. Alshdaifat only had a broker's interest and did not deal in the artifacts himself.  Somehow, however, he now finds himself charged together with the principals of those transactions for allegedly violating technical Customs laws in the mailing and shipping of the merchandise, a process in which he did not participate.

He now seeks various relief in pretrial motions, including: (1) dismissal of the Indictment; (2) suppression of evidence, including physical and digital search evidence, and post-arrest statements; (3) the granting of an evidentiary hearing to resolve any factual disputes related to these motions; (4) the granting of an order compelling the government to produce expert witness discovery and provide timely notice of intent to use any Rule 404(b) evidence; (5) the granting of leave to join in applicable motions of co-defendant Joseph Lewis; and (6) any other relief that the Court deems just and proper.

<u>**ARGUMENT**</u>

<u>**Motions Challenging the Indictment**</u>

**I.**

**THE SMUGGLING COUNTS MUST BE DISMISSED BECAUSE THE FEDERAL SMUGGLING STATUTE, 18 U.S.C. § 545, AS INTERPRETED BY THE SECOND CIRCUIT, IS VOID FOR VAGUENESS, AND IS VAGUE AS APPLIED TO MR. ALSHDAIFAT'S CHARGED CONDUCT**

The federal smuggling statute, 18 U.S.C. § 545, has been interpreted by federal courts to mean different things depending on where a defendant conducts his business. Mr. Alshdaifat could not be charged with a smuggling crime had the merchandise been mailed to New Jersey, Pennsylvania, or Delaware because the Third Circuit has ruled since 1994 that Section 545 requires an intent to deprive the United States of revenue. *United States v. Menon*, 24 F.3d 550, 556-57 (3d Cir. 1994). In this case, the merchandise involved in the Section 545 offenses are classified as "antiques," and under the Harmonized Tariff Schedule of the United States, Heading 9706, they are duty free. *See* 19 C.F.R. § 10.53. Thus, in the Third Circuit, there would be no crime here. However, in the Second Circuit, the Section 545 smuggling crime has been more expansively interpreted to cover conduct beyond an intent to defraud the United States of its right to revenue. *See United States v. Borello,* 766 F.2d 46, 51 (2d Cir. 1985) (citing *United States v. McKee*, 220 F.2d 266, 269 (2d Cir. 1955)). Given that the courts cannot agree on the meaning of this statute, ordinary people will find it difficult to understand what conduct is actually prohibited by the statute.

The issue before this Court, therefore, is what Congress intended when it criminalized an "intent to defraud" the government in Section 545, and specifically, whether the meaning of "defraud" in that statute extends beyond a deprivation of property rights. Because the Second

3

Circuit's original decree in *McKee* is almost 60 years old, it was decided long before the Supreme Court's more recent set of cases in *McNally v. United States*, 483 U.S. 350, 359 (1987), and *Skilling v. United States*, 130 S.Ct. 2896, 2929-30 (2010).   In these latter cases, the Supreme Court has significantly narrowed the category of statutes in which the meaning of "defraud" extends beyond a loss of property rights.  We contend here that the Second Circuit's interpretation of Section 545, first decided in *McKee* and later affirmed in *Borello*, does not survive the Supreme Court's rulings in *McNally* and *Skilling*.  Even if it did, those rulings make clear that the Second Circuit's interpretation of Section 545, *i.e.,* not requiring an intent to defraud the United States of revenue, renders the statute void for vagueness, or at least, void as applied to the conduct charged against Mr. Alshdaifat here.

### A.      The "Void for Vagueness" Legal Standard

The void-for-vagueness doctrine derives from the constitutional guarantee of due process, which requires that a penal statute define a criminal offense:  "[1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Skilling,* 130 S.Ct. at 2927-28 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).  The "touchstone" of the notice prong "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).  The arbitrary enforcement prong requires that a statute give "minimal guidelines" to law enforcement authorities, so as not "to permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 358 (internal quotations omitted).

"What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what the fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). The question of what conduct is encompassed within an "intent to defraud" has now been a recurring debate in the federal courts over the last several years.  It continues to defy clear definition across statutes.  This is the issue at stake here.

### B.   The Current Section 545 Statute

Section 545 is divided into two paragraphs and states two different means of violating the statute.  These generally have been described as:  (1) smuggling, either by "clandestinely" introducing merchandise into the United States, or by passing through the customhouse a false, forged, or fraudulent invoice or other documents; and (2) importing merchandise into the United States contrary to law. *See United States v. Lespier*, 601 F.2d 22, 24 (1st Cir. 1979) (citing *Babb v. United States*, 218 F.2d 538, 540 (5th Cir. 1955) (holding the first and second paragraphs of the smuggling statute, 18 U.S.C. § 545, constitute distinct and separate offenses); *United States v. Westover*, 511 F.2d 1154, 1155 n. 2 (9th Cir. 1975) (same);  Sand, *et al.,* 1 *Modern Federal Jury Instructions*, ¶ 23.01, *et seq.* ("Section 545 contains two separate offenses.  The first paragraph . . . describes the offense of smuggling and will be referred to as the smuggling provision.  The second paragraph . . . describes the offense of importing merchandise into the United States contrary to law.")

Specifically, the statute provides:

> Whoever knowingly and willfully, ***with intent to defraud the United States***, smuggles, or clandestinely introduces or attempts to introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or

> Whoever fraudulently or knowingly imports or brings into the
> United States, any merchandise contrary to law, or receives,
> conceals, buys, sells, or in any manner facilitates the
> transportation, concealment, or sale of such merchandise after
> importation, knowing the same to have been imported or brought
> into the United States contrary to law . . .
>
> Shall be fined under this title or imprisoned not more than 20
> years, or both.

18 U.S.C. § 545 (emphasis added).

Mr. Alshdaifat is charged with three counts of violating Sections 545 and 2 (Counts 4-6), and one count of conspiring to violate Section 545 (Count 1). In its Indictment, the government charges the entirety of the statute, including both paragraphs, *i.e.,* the smuggling provision and importation contrary to law. The defendants have sought a bill of particulars to clarify the government's allegations as to the various offenses charged here.[1] From the discovery produced to date, it appears that the facts relied upon by the government stake out a claim of smuggling based either on "clandestinely" introducing merchandise or false statements on entry documents. The government has yet to indicate how the introduction of the Egyptian coffins into the United States was "contrary to law."[2] Until the government explains its theory on the second paragraph of Section 545, we will focus our attention on the thrust of the government's allegations based on the "intent to defraud the United States" theory in paragraph one.

---

[1]     Depending on the results of the bill of particulars motion, the government should be directed to elect which theory of prosecution it intends to proceed on at trial in order to avoid unanimity issues with the jury. *See, e.g., United States v. Place*, 757 F.Supp.2d 60, 62 (D. Mass. 2010). The Court identified the possible pitfalls in the government's charging decisions during the plea allocution of co-defendant Morris Khouli. (*See* Ex. E to Mazurek Decl. in Support of Alshdaifat Motions, Plea Hearing Tr. 4/18/12, at pp. 7-10.) To avoid significantly complicated unanimity instructions to a jury, the government should be required to elect prior to trial its prosecution theory.

[2]     The defendants' bill of particulars motion is scheduled to be heard before Magistrate Judge Gold on May 18.

If the "intent to defraud the United States" theory is to be saved, it requires a limiting construction interpreting the intent element as an intent to deprive the United States of revenue. *See Skilling*, 130 S.Ct. at 2929 ("It has long been our practice [ ], before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction").

### C.     The Split in the Federal Circuit Courts About the Meaning of Section 545

As stated above, there currently exists a split in the Circuits about the meaning of 18 U.S.C. § 545.  The majority of Circuits that have interpreted Section 545 have ruled that its "intent to defraud the United States" element extends beyond a deprivation of money or property rights.[3] *See Borello,* 766 F.2d at 51 (citing *Mckee*, 220 F.2d at 269); *United States v. Ahmad*, 213 F.3d 805, 810-11 (4th Cir. 2000); *United States v. Robinson*, 147 F.3d 851, 853 (9th Cir. 1998); *United States v.Kurfess*, 426 F.2d 1017, 1019 (7th Cir. 1970).

However, former Chief Judge Edward R. Becker of the Third Circuit conducted a more comprehensive and thoughtful analysis of the plain meaning and legislative history of the current Section 545 statute, and determined that "the history of § 545 demonstrates that Congress did not intend such a broad reading here." *Menon*, 24 F.3d at 555.  Relying on the triumvirate of

---

[3]     However, none of the decisions listed here attempt to delineate the parameters of the intent required.  For example, if the intent required is interpreted to mean avoiding and defeating customs laws, are all Customs laws encompassed by the statute?  Is an intent to avoid and defeat Customs regulations, as opposed to statutes, covered by this broader intent requirement?  Is an intent to defeat Customs laws required at all, or could the statute cover any intent to deceive a Customs inspector that makes it harder for the officer to complete his or her duties?  These are the same kinds of unanswered questions that eventually doomed large chunks of the federal "honest services" statute in *Skilling,* 130 S.Ct. at 2933 n. 44 (in rejecting the government's proffered theory of self-dealing as conduct covered by 18 U.S.C. § 1346, the Court recognized that the government's formulation "leaves many questions unanswered . . . These questions and others call for particular care in attempting to formulate an adequate criminal prohibition in this context.").

Supreme Court decisions in *McNally*, *Hammerschmidt v. United States,* 265 U.S. 182, 185 (1924) (interpreting a predecessor statute to the current 18 U.S.C. § 371 conspiracy statute), and *United States v. Cohn*, 270 U.S. 339, 343 (1926) (construing the penal False Claims Act statute as requiring a defendant to cheat the government out of money or property), Judge Becker concluded that the meaning of "defraud" must be interpreted "in the context of the particular statute that uses the term."[4] *Menon,* 24 F.3d at 556.  Judge Becker further acknowledged that based on the earliest of these rulings in *Hammerschmidt*, in the context of a a fraud against the United States, "[i]t seems appropriate [ ] to construe § 545 as prohibiting acts that prevent the United States from carrying out its statutory duties."   Despite this presumption, however, he found that because the overwhelming evidence of Congress' intent in enacting Section 545 was to limit the fraud to an intent to deprive the United States of revenue, this statute must be given a more narrow construction. *Id.* at 556-57.

The evidence relied upon by Judge Becker in *Menon* was quite revealing.  He noted that the predecessor statute to the current 18 U.S.C. § 545, required that the defendant intend "to defraud *the revenues of* the United States." *Id.* at 556 (citing 19 U.S.C. § 1593 (U.S.C., 1940 ed.) (emphasis in *Menon*).  Congress then omitted the language "the revenues of" when it re-codified the entire Federal Criminal Code in 1948. *Id.*  This re-codification was described as "the substitution of plain language for awkward terms, reconciliation of conflicting laws, omission of superseded sections, and consolidation of similar provisions." *Id.* at 557 (citing H.R. Rep. No. 304, 80th Cong., 1st Sess. (1947) (reprinted in 18 U.S.C.C.A. 439, 440).

---

[4]    Of course, Judge Becker did not have the benefit of the Supreme Court's decision in *Skilling*, which only further narrowed the category of statutes for which "defraud" meant something beyond a deprivation of money or property.

Because the statutory change here occurred as part of a general re-codification of the entire criminal code, and not as part of any amendment to this particular statute, there was *no* evidence that Congress intended any substantive change at all. *Id.* In fact, in the notes to the publication of the re-codified Federal Criminal Code, Congress made clear that "all substantive changes were explicitly set forth in the revisers' notes," and that "it intended no other substantive changes." *Id.* No substantive changes to the re-codified Section 545 were indicated in the reviser's notes, therefore Congress clearly expressed its intent not to change the law. *Id.* Judge Becker cautioned that: "Absent a compelling need, we should not read as substantive a change initiated by the revisers and probably not considered by Congress." *Id.*

The *Menon* court also relied upon the rule of lenity, holding that "[a]t a minimum, we think that the legislative history makes the meaning of 'defraud the United States' in § 545 ambiguous given that, as we have seen, the meaning of defraud varies from statute to statute. As the Court did in *McNally*, we rely on the rule of lenity to hold that because the meaning of defraud is ambiguous in the context of § 545, that section requires an intent to cause a deprivation of property or money." *Id.*

Mr. Alshdaifat respectfully submits that the reasoning and holding of *Menon* should be extended here, and preserves for the record, his objection to the Second Circuit's earlier holdings in *McKee* and *Borello*, insofar as they were wrongly decided. Of course, we recognize that this Court is currently bound by the decision of a prior panel ruling of the Second Circuit. However, this does not foreclose Mr. Alshdaifat's vagueness challenge, given the ambiguity in the language of the statute, its legislative history, recent decisions of the Supreme Court providing direction on how to interpret vague criminal prohibitions based on an "intent to defraud," and the fact that the conduct alleged here did not involve an intent to deprive the United States of money or property.

9

**D.    Because the Importation of Antique Egyptian Coffins Are Duty-Free, Ordinary Persons Would Not Be On Notice That They Could Violate the Federal Smuggling Statute, and Without a Deprivation of Property Requirement, Law Enforcement Had Inadequate Direction to Avoid Arbitrary Enforcement**

Section 545 requires an intent to defraud the government to "smuggle[ ]" goods into the United States. 18 U.S.C. § 545. This intent is left undefined by the statute. However, its context leaves a clear impression that its meaning is tied to an intent to deprive the United States of duty revenue. This is true for at least two reasons.

First, the plain language of Section 545 is limited to tangible goods or merchandise that have ***commercial*** value:  "merchandise which should have been invoiced." 18 U.S.C. § 545. (*See* Sand, 1 *Modern Federal Jury Instructions,* at ¶ 23.01, Instruction 23-6, "Intent to Defraud the United States":  "For the purposes of section 545, 'intent to defraud the United States' means intent to avoid and defeat the United States customs laws. The goods in question, therefore, ***must have some commercial value in order to come within the smuggling provision of the statute***.") (citing *One Lot Emerald Cut Stone and One Ring v. United States*, 409 U.S. 232 (1972) (emphasis added)). A person of ordinary intelligence could infer from this that the statute seeks to punish those who try to avoid the government's collection of duties and revenue, as opposed to merely ensuring the "[a]dequate reporting of merchandise being brought into the country." *McKee*, 220 F.2d at 269. Why else have a restriction on reporting tangible goods that have a recognized commercial value?

Consider the following hypothetical. I traveled to Poland to visit my relatives and was given paintings by my uncle that he had hanging in his bedroom for years. My uncle was not in the business of selling paintings and these paintings never had commercial value of any kind, but they are clearly merchandise or tangible goods. On my return to the United States, I decided not

to declare to Customs that I had the paintings in my luggage. Could I have violated Section 545 by not declaring the items and "clandestinely" introducing them into the United States? According to the Second Circuit's decision in *McKee*, my intentional decision not to declare the paintings would be a felony punishable up to 20 years in prison. *McKee*, 220 F.2d at 269 ("Adequate reporting of merchandise being brought into the country is absolutely necessary to the enforcement of the customs laws, and failure to comply with these requirements is just as criminal as failure to pay the customs fees.") Can it be that Congress intended to penalize my failure to announce my uncle's paintings at the border? If "adequate reporting of merchandise being brought into the country" is the standard, then hypotheticals such as this one would be endless.

Second, the plain language of the statute speaks about making false declarations to the customhouse: "[whoever] makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper." 18 U.S.C. § 545. Again, this language presumes that the merchandise being brought into the country has a reported monetary value and this value is relevant to the conduct of the offense. It would be another natural inference by an ordinary person to believe that making false statements on invoices, and like documents, in the context of fraud, is intended to lower the amount of tariff required to be paid on the merchandise brought into the country. The amounts shown on an invoice would have no bearing on the reporting or inspection of merchandise; it would more intuitively effect the calculation of tariffs.

Another reason to conclude that Section 545 is unconstitutionally void without a money or property nexus is that it leaves "little guidance as to the conduct it prohibits." *See United States v. Murphy*, 323 F.3d 102, 116 (3d Cir. 2003) (acknowledging the vague nature of the

11

phrase "intangible right of honest services" gave little guidance to federal agents and prosecutors seeking to enforce the statute).  Without the coherent limiting principle of deprivation of property rights, the Section 545 statute suffers from the same defects as the "honest services" statute.  Does the "intent to defraud the United States" language in the statute equate to an intent to defeat the Customs laws?  How should these laws be defined?  Are Customs regulations, policies, or public directives included in this analysis?  If no Customs law is being violated by a false statement on an invoice, then is it sufficient to convict based only on an intent to make a false statement?   How is a court to evaluate the element of materiality in such a circumstance?

At the plea hearing for co-defendant Morris Khouli, the Court recently got to the crux of this matter by posing the direct question to the prosecutor:

| The Court: | Well, what does defraud mean in this context? |
| --- | --- |
| Ms. Orenstein: | In this case, the fraud against the United States would be impeding the function of the Customs agency from the proper review of items entering the country. |

(Ex. E,[5] Tr. 4/18/12, at 10.)  This answer provides no fair notice to ordinary persons of what is prohibited and encourages arbitrary enforcement because it gives no clear criteria on how this "fraud" is to be judged:  what "functions of the Customs agency" are implicated?  Are they circumscribed in any way?  What is encompassed by a "proper review of items," particularly in light of the government's admission in the Indictment that most shipments of goods into this country are not inspected at all? (*See* Indictment, ¶ 4:  "Due to the large volume of cargo that arrived at U.S. ports each day, Customs sometimes cleared shipments without manually inspecting the contents of the shipments.") This same series of questions remain unanswered.

---

[5]     All references to Exhibits to these motions will hereinafter be marked as "Ex. __", and will be annexed to the Mazurek Declaration in Support of Salem Alshdaifat's Omnibus Pretrial Motions.

All of these issues are relevant here because the government seeks to convict Mr. Alshdaifat on the basis of inadequate Customs documentation for merchandise that was duty-free.  The government claims that the importer (in this case, Mr. Khouli), in arranging shipments of Egyptian coffins into the United States, utilized methods "that were contrary to law and intended to avoid detection and scrutiny by Customs." Indictment, ¶ 13.  In enumerating the means used to accomplish this "fraud," the Indictment specifies:  "(1) making false declarations to Customs about the country of origin and value of Egyptian antiquities; (2) using vague and misleading descriptions on shipping labels and Customs paperwork, such as 'antiques,' 'wood panels,' and 'wooden painted box,' instead of declaring that the shipments contained protected antiquities; (3) splitting a single antiquity into separate packages that were shipped individually over the course of several weeks to conceal the size and value of the fully-assembled antiquity; (4) shipping packages to a third party in the United States who then claimed the packages and forwarded them to Khouli upon receipt, and making false declarations stating that the third party was the consignee or purchaser of the shipments ('transshipping'); [and] (5) failing to file entry or informal entry documents with Customs for packages shipped by post."  Except for the first allegation of "false declarations" about country of origin and the value of goods being imported, the rest of these allegations would not even amount to technical violations of Customs regulations.

As earlier stated, the government has yet to indicate which statute(s) this conduct allegedly violated to be "contrary to law." *Id.*  This information is critical to an evaluation of the government's claims here because, at least with respect to the second paragraph of Section 545, "law" has been interpreted to mean a statute.  *United States v. Alghazouli*, 517 F.3d 1179, 1183-1187 (9th Cir. 2008).  "Congress intended the term 'law' in § 545 to include a regulation when,

but only when, a statute (a 'law') specifies that a violation of that regulation constitutes a crime."
*Id.* at 1183.  Accordingly, to the extent that any of the aforementioned conduct specified in the
Indictment only violates Customs regulations -- without an express statute that criminalizes a
violation of those regulations -- they cannot form the basis of a Section 545 crime under
paragraph 2, *or* provide a recognized basis for an "intent to defraud" under paragraph 1.

  For example, one of the above allegations is that for shipments imported by post (Counts
4 and 5), the defendants "fail[ed] to file entry or informal entry documents with Customs."
Indictment, ¶ 13.  The reporting requirements for "formal" or "informal" entry documents are
established pursuant to Customs regulations. *See* 19 C.F.R. §§ 143.21, 143.23.  Thus, violations
of these administrative regulations alone are insufficient as a matter of law to satisfy the
"contrary to law" provision in Section 545.

  This example provides further basis for a void-for-vagueness finding in the "intent to
defraud" language in the first paragraph of the statute.  Does the scope of Section 545's "intent to
defraud" extend to an intent to violate a Customs regulation, as opposed to Customs laws?  How
can this statute be interpreted to have any limitations if this is true?  Imagine a person in the
United States who is seeking to have a friend or colleague overseas send him a package of goods,
and these goods total $2,000 or less.  According to U.S. Customs regulations, 19 C.F.R. §§
143.21(a) and 23, the shipping label must contain all of the required "informal entry"
information.  This information includes: (1) identification of goods, (2) whether they are
dutiable, (3) country of origin, (4) whether the item is invoiced, (5) whether the package contains
prohibited articles, (6) and a certification that the amount of goods on the invoice matches the
contents (no shortage or overage). *Id.*  According to the interpretation of *McKee*, if the recipient
of the package intentionally failed to tell his shipper to include all of this data on the shipping

14

label, if only because it was too much of a hassle, is that enough of an intent to violate the 20-year felony statute at Section 545? This likely would mean that there are thousands of violations of Section 545 happening every day.

The allegations against Mr. Alshdaifat in this Indictment are extremely troubling because the conduct being prosecuted is more akin to the above hypotheticals than the "core" conduct that Congress clearly intended to prohibit by its smuggling statute, *i.e.,* the intentional avoidance of tariff duties and the importation of contraband. No reasonable person would believe that, by this prosecution, the government is signaling its intent to enforce all "vague and misleading descriptions on shipping labels." (Indictment, ¶ 13.) They chose this one because of the nature of the goods inside -- pieces of Egyptian coffins. Perhaps the government is motivated by political reasons. Perhaps it wants to ensure good continued relations with Egypt as it forges a new government. We know what it is not motivated by, and that is to return an artifact to its rightful owner, because the government here does not claim that the imported coffins were stolen property. Whatever the reason, it cannot be denied that prosecuting a case with 20-year felonies based largely on "vague and misleading descriptions on shipping labels," raises the specter of arbitrary enforcement. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000) (holding statute can be impermissibly vague "if it authorizes or even encourages arbitrary and discriminatory enforcement").

The vagueness of the government's claims is best illustrated by inspecting its actual evidence. In Counts 4 and 5, the government charges Mr. Alshdaifat with violations of Section 545 relating to international mail shipments. (Indictment, ¶ 20, p. 9.) These shipments allegedly contained wooden panels of the walls of one of the inner coffins. They were mailed in the same way that we would mail a holiday gift to friends in Europe or Mexico or Canada. They were put

15

in an international air mail pouch; a small shipping label was completed with the sender and recipient's information filled out by hand; the label was affixed to the front of the package; and postage was paid.  The government's claims of felony criminal conduct against Mr. Alshdaifat in these two felony counts arise out of the words used by the sender of these mail packages on the Emirates Post shipping labels.  On these shipping labels, in the area marked for "International Mail Shipments Only," the sender, Mr. Ramadan, checks the box marked, "Merchandise," and underneath writes the English word, "antique." (*See* Ex. F.)  This is the conduct that the government claims is so deceptively "vague and misleading" that it satisfies the "intent to defraud the United States government" provision of Section 545.  Ordinary persons are simply not on notice to believe that this conduct is criminal and punishable up to 20 years in prison.

In sum, the current expansive interpretation in the Second Circuit of Section 545's "intent to defraud" provision is unconstitutionally vague.  In this case, both "as a general matter," the intent element does not "provide sufficiently clear standards to eliminate" the risk of lack of notice to ordinary persons of what conduct is prohibited and to eliminate the concern of arbitrary enforcement. *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006).  And as a specific matter, the facts presented here do not alleviate this concern -- instead they accentuate it.  This is not the case where "the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and fact finders might have in other, hypothetical applications of the statute." *Id.* at 494.  The fact pattern confronting this Court represents the fringes of the conduct that leads to constitutional due process concerns.  Neither the limits of the charged crime or the direction to law enforcement are reasonably defined.

If this Court were to follow the dictates of *Skilling* and construe the "intent to defraud" provision of Section 545 narrowly in order to save the statute, it would have to add the limiting provision of *Menon*, and find that the only conduct criminalized by the statute was knowing and intentional conduct to deprive the United States of money or property.  *Skilling*, 130 S.Ct. at 2931 (adopting a limiting construction to the "honest services" statute in order "[t]o preserve the statute without transgressing constitutional limitations").

This limiting construction, however, does not save the government on the charges here. Because the Indictment does not allege an intent to deprive the government of money or property, the government cannot make out a showing of violations of Section 545.  Accordingly, this Court muse dismiss Counts Four, Five, and Six against Mr. Alshdaifat.

In addition, for the same reasons, Count One must also be dismissed.  This count charges a conspiracy under 18 U.S.C. § 371, but more specifically, a conspiracy only to commit violations of Section 545.  (*See* Indictment, ¶ 15.)  Because the sole object of the conspiracy fails to state an offense, even under a limiting construction of Section 545, this Count must also fail.

Finally, if these counts are dismissed, the money laundering conspiracy count, at Count Two, must also be dismissed because the unlawful specified activity charged as an element in that count, *i.e.,* the smuggling violations, could not be proven.

**II.**

### COUNTS FOUR, FIVE AND SIX SHOULD BE DISMISSED BECAUSE THE EASTERN DISTRICT OF NEW YORK IS NOT THE PROPER VENUE FOR THESE CHARGES

ōBoth Rule 18 of the Federal Rules of Criminal Procedure and the Constitution require that a person be tried for an offense where that offense is committed.ö *United States v. Cabrales*, 524 U.S. 1, 5 (1998) (citations and internal quotations omitted); *see also United States v.*

*Anderson*, 328 U.S. 699, 703 (1946) ("[T]he *locus delecti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it."). Indeed, the Constitution protects a criminal defendant's right to proper venue in two places: Article III and the Sixth Amendment.

Courts have vigorously protected the rights of criminal defendants in this regard. In fact, the Supreme Court has expressly held that, when an indictment charges a defendant with multiple counts, "venue must be proper with respect to *each* count." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989) (emphasis added); *see also United States v. Novak*, 443 F.3d 150, 161 (2d Cir. 1989) (repeating the requirement that each and every count in an indictment must independently allege proper venue and the government must prove venue as to each count).

Based on the above clear dictate from the Supreme Court, this Court should dismiss Counts Four through Six of the Indictment for failing to allege proper venue in the Eastern District of New York. In each of these counts, the government refers to importation shipments, but fails to specify the Port of Entry where these entered the United States. This is critical to a determination of venue in this district. With respect to Counts 4 and 5, the allegations refer to international mail shipments, some of which were mailed with destinations in Connecticut and Manhattan -- neither of which are located in the Eastern District of New York. The government has not produced in discovery any evidence that these mail shipments entered the United States in the Eastern District of New York. Nor has the government posited a separate theory of venue for these counts. Absent such a showing, this Court should dismiss these counts for lack of venue.

Count 6 charges an air cargo shipment that supposedly was to be placed on an Emirates Air flight to Kennedy International Airport.  However, again, the government has not produced in discovery any evidence to show that this air cargo shipment arrived at Kennedy Airport.  We again ask the government to make the showing that the alleged importation discussed in this count actually arrived in the United States in the Eastern District of New York.

As the Second Circuit has repeatedly stated, "the criminal acts in question must "bear substantial contacts" with" the venue in which the charges are brought. *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000).  The factors for the Court to consider are "(1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs, and (4) the suitability of the venue chosen for accurate factfinding." *Id.* at 92.

In this case, the locus of the alleged crimes is difficult to discern.  All four of the charged defendants are dispersed in different parts of the globe.  Only Mr. Khouli resides in Brooklyn, and even he has his business outside this district in Manhattan.  During the time relevant to the charges in the Indictment, Mr. Alshdaifat resided and did business in Canada.  Mr. Lewis resided and did business in Virginia.  Finally, Mr. Ramadan resided and did business in the U.A.E. , where he presumably remains to this day, having not presented himself to the jurisdiction of this Court.  Thus, the government must make some factual showing of nexus to the Eastern District of New York that is more central to the charged smuggling offenses other than the district where co-defendant Khouli resides.

On a pre-trial motion to dismiss an indictment for lack of venue, the government has the burden of "showing that the indictment alleges facts sufficient to support venue." *United States v. Peterson*, 357 F.Supp.2d 748, 751-52 (S.D.N.Y. 2005).  As noted above, the Second Circuit has required "substantial contacts" with a venue in the case of a "continuing offense." *Saavedra*,

19

223 F.3d at 93.  The government's bare conclusory assertions in this Indictment, which are bereft of allegations of acts occurring in this district relating to the substantive smuggling counts (Counts 4-6), are insufficient to make the *Peterson* showing. *Id.* at 752. (holding indictment "containe[d] more than just conclusory allegations of the existence of venue; it also contain[ed] allegations of specific acts occurring in the Southern District of New York, including [among other things], the use of two insurance brokerage companies located in New York.")

If the government were compelled to present a factual proffer as to venue at this stage of the proceedings, and this proffer was deemed insufficient, the parties and the Court would be able to conserve significant resources by avoiding a complex and lengthy trial on charges that have no "substantial contacts" with this district at all.

## Motions to Suppress Evidence

### III.

### THE SEARCH WARRANTS FOR MR. ALSHDAIFAT'S YAHOO! E-MAIL ACCOUNT WERE CONSTITUTIONALLY DEFECTIVE BECAUSE THEY LACKED PROBABLE CAUSE, WERE OVERBROAD "GENERAL WARRANTS," AND WERE BASED ON KNOWINGLY OR RECKLESSLY FALSE STATEMENTS IN THE SUPPORTING AFFIDAVIT

The government obtained two search warrants of Mr. Alshdaifat's e-mail account, "salim_iman@yahoo.com."  The first warrant was issued on March 29, 2010 by Magistrate Robert M. Levy in the Eastern District of New York. (*See* Ex. G, Search Warrant, Attachment A (Yahoo! Rider), and Application in Support of Search Warrant, M-10-341) (hereinafter "First E-Mail Warrant 3/29/10").  The second warrant was issued on January 25, 2011, by Magistrate Cheryl A. Pollak in the Eastern District of New York. (*See* Ex. H, Search Warrant, Attachment A

(Yahoo! Rider), and Application in Support of Search Warrant, M-11-079) (hereinafter "Second E-Mail Warrant 1/25/11").

Mr. Alshdaifat respectfully submits that each of these warrants was constitutionally defective.  The application for the First E-Mail Warrant 3/29/10 wholly lacked probable cause to indicate that evidence of a crime would be found within the e-mail account sought to be searched.  It also was grossly overbroad, amounting to an impermissible "general warrant."  Because the Second E-Mail Warrant 1/25/11 relied on tainted evidence produced from the First E-Mail Warrant 3/29/10, it also lacked the requisite probable cause.  Finally, the government again sought an unconstitutional "general warrant" by making a blanket "all records" request in the second warrant for digital evidence.

As an initial matter, there can be no question that Mr. Alshdaifat had a subjective expectation of privacy in the contents of his personal Yahoo! e-mail account.  (*See* Alshdaifat Decl., 4/30/12), at Ex. A, ¶¶ 3-4.)  Yahoo!'s privacy policies reinforce Mr. Alshdaifat's expectations of privacy. (*See* Yahoo! Privacy Policy, www.info.yahoo.com/privacy/us/yahoo/mail/deatils.html ("No person reads your email, nor is any personal information collected or stored" by Yahoo!).

The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2701-2712, expressly acknowledges the substantial privacy interests that individuals have in the contents of their e-mail, codifying these important privacy rights.  Courts also have recognized that individuals have a reasonable expectation of privacy in the contents of their e-mail accounts.  *See, e.g., United States v. Zavala*, 541 F.3d 562, 577 (5th Cir. 2008) (finding defendant had reasonable expectation of privacy regarding information located on his cell phone, including e-mails); *United States v. Forrester*, 512 F.3d 500, 511 (9th Cir. 2008) (holding that the contents of

21

e-mail communication deserve Fourth Amendment protection); *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F.Supp.2d 548, 560-61 (S.D.N.Y. 2008) (collecting cases).

We now address each of the constitutional defects in the e-mail warrants below.

**A.    The First E-Mail Warrant 3/29/10 Was Issued Without Probable Cause to Believe That Evidence of a Crime Would Be Found Within the Alshdaifat Yahoo! E-Mail Account**

1.    <u>The Legal Standard</u>

To protect against unreasonable searches and seizures, the Fourth Amendment states that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  It has long been recognized that probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even  usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *accord United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011).  Nevertheless it is generally understood that "probable cause to search is demonstrated where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. at 238).  This required nexus between the items sought and the "particular place" to be searched protects against the issuance of general warrants, "instruments reviled by the Founders who recalled their use by Crown officials 'to search where they pleased.'" *Clark*, 638 F.3d at 94 (quoting *Stanford v. State of Texas*, 379 U.S. 476, 481 (1965) (discussing how abusive use of general warrants contributed to Revolution, and thereafter, to demand for Fourth Amendment); *see also Boyd v. United States*, 116 U.S. 616, 624-30 (same); Wayne R. LaFave, *Search and Seizure:  A Treatise on the Fourth Amendment*, § 1.1, at 7 (4th ed. 2004).

In assessing probable cause, courts are to look at the "totality of the circumstances," *Gates*, 462 U.S. at 230-31, and should apply a "flexible, common-sense" approach. *Texas v. Brown*, 460 U.S. 730, 742 (1983). "[T]he evidence . . . must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Gates*, 462 U.S. at 231-32. "Finally, in considering an attack on a search warrant, great deference should be afforded to a probable cause determination made by the magistrate judge. . . . That deference, however, is obviously 'not boundless.'" *United States v. Hickey*, 16 F.Supp.2d 223, 238 (E.D.N.Y. 1998) (quoting *United States v. Leon*, 468 U.S. 897, 914 (1984)).

> 2.   The Affidavit in Support of the First E-Mail Warrant 3/29/10 Completely Failed to Show -- Let Alone By a "Substantial Basis" -- That a Particular Search of Mr. Alshdaifat's Yahoo! Personal E-Mail Account Would Uncover Evidence of Wrongdoing

The Affidavit by ICE Special Agent Brenton Easter in support of the First E-Mail Warrant 3/29/10 was submitted not only for a general search of Mr. Alshdaifat's e-mail account, "salim_iman@yahoo.com," but also for ***10 other e-mail accounts.*** (*See* Ex. G, Application in Support of Warrant, sworn on 3/29/10.)   This request, therefore, was quite expansive and intrusive.  It sought authorization to search literally tens of thousands of e-mail communications of several individuals.  It was, in short, a daunting endeavor.  In taking on this task, however, Agent Easter failed to give particular attention to *each* account he sought to intrude. *Greenstreet v. County of San Bernardino*, 41 F3d. 1306, 1309 (9th Cir. 1994) ("A search warrant designating more than one person or place to be searched must contain sufficient probable cause to justify its issuance as to each person or place named therein.")  This oversight led to the eventual error in issuing a warrant to search Mr. Alshdaifat's personal e-mail account.

It is quite shocking that in the entirety of Agent Easter's Application, he cites to a ***single e-mail*** sent to Mr. Alshdaifat's Yahoo! e-mail address -- dated 18 months before the search

warrant request -- as his "substantial basis" to believe that evidence of crimes will be located in e-mails from this account. (*See* Ex. G, Application, p. 26, ¶ 53-55.)  Moreover, the e-mail cited in Easter's Application is insufficient by itself to believe that any crime was being committed at all -- and certainly *no* crime in the United States.  The subject of Agent Easter's "silver bullet" e-mail was a package of coins to be shipped to Mr. Alshdaifat in Ontario, Canada (*id.*, p. 26, ¶ 54), clearly not invoking the U.S. Customs offenses cited in the Application, 18 U.S.C. §§ 542, 545.[6]

The offenses specifically referenced in the Easter Affidavit, for which he sought to prove probable cause to search 11 e-mail accounts, were:

> (1) *entry* of goods by means of false statements, contrary to Title 18, United States Code, Section 542, (2) smuggling goods *into the United States*, contrary to Title 18, United States Code, Section 545, and  (3) money laundering by transmitting funds from a place in the United States to a place outside the United States with the intent of promoting smuggling of goods, contrary to Title 18, United States Code, Section 1956(a)(2)(A).

Ex. G, Application, p. 2, Preamble (emphasis added).[7]

---

[6]     The title of 18 U.S.C. § 542 is:  "Entry of goods by means of false statements."  As to 18 U.S.C. § 545, it criminalizes, "Smuggling goods *into* the United States." (Emphasis added.)

[7]     Notably, Agent Easter goes to great lengths in his Application to speak about "trafficking in cultural property" as if cultural property was some notorious contraband, such as controlled substances, weapons, or explosives.  Of course, cultural property is far from being contraband *per se*.  One needs look no further than the trade of some of the largest auction houses in the world, such as Sotheby's and Christie's, to recognize the legal and valued place that cultural property maintains in the global marketplace.  So, as an initial matter, reference to cultural property "smuggling" needs to be put in an appropriate context.   The nefarious context that Agent Easter seeks to convey in his Application is that of trading in stolen property.  (*See* Ex. G, Application, p. 5, ¶ 6.)  However, again here, Agent Easter is seeking to prejudicially incite the reviewing Magistrate with irrelevant material.  He does not even claim in his Application that he seeks evidence of violations of the National Stolen Property Act (18 U.S.C. § 2315).  Clearly, if he had any basis for such an allegation, he would have included this statutory offense as one of the enumerated crimes for which he had probable cause to conduct a search.  Thus, this portion of the Easter Application should be stricken and disregarded by the Court as completely irrelevant. (Ex. G, Application, p. 5, ¶ 6.)

The evidence presented in Easter's Affidavit must be measured against these crimes. While the Affidavit traverses across several different e-mail accounts and alleged incidents of "smuggling" involving various other individuals, the only review that is relevant to this motion is whether the Agent made a probable cause showing to search the particular place of Mr. Alshdaifat's personal e-mail account. *See, e.g., Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (a "person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person").

To this end, Agent Easter first referred to the events which make up the claims in this Indictment:  the alleged "smuggling" of a set of Egyptian coffins.  This alleged "smuggling" event took place, according to Easter's Affidavit, from March to August 2009.  (Ex. G, Application, pp. 14-18, ¶¶22-35.)  Therefore, this crime was allegedly completed more than seven months prior to the search warrant request.  More importantly, however, is what the Agent revealed in his Affidavit about his evidence of Mr. Alshdaifat's alleged participation.  The totality of what is communicated here is that Mr. Alshdaifat sent an e-mail to Mr. Khouli in March 2009 advertising the coffins. (Ex. G, Application, p. 15, ¶ 24.)  A month later, Mr. Khouli wrote back asking for an invoice for the advertised coffin set. (*Id.*, ¶ 27.)  Mr. Alshdaifat responded by forwarding an e-mail from the dealer who was selling the coffins, Ayman Ramadan, which included ***Mr. Ramadan's invoice*** (not an invoice from Mr. Alshdaifat, who was acting as a mere intermediary, or introducing broker).  (*Id.*)  Clearly, there is nothing criminal about Mr. Alshdaifat's forwarding an advertisement of another dealer, who owned the coffins, to a collector who might be interested in purchasing them.  This is completely innocent activity.

25

After Mr. Alshdaifat connected Mr. Khouli with the seller of the merchandise (Mr. Ramadan), Mr. Khouli thereafter e-mailed directly with Mr. Ramadan. (*Id.*, ¶¶ 30, 32, 34.)  No other e-mails involving Mr. Alshdaifat are presented in Easter's affidavit about this transaction.

Incredibly, ***there is not a single line in the entire affidavit which connects Mr. Alshdaifat, or his e-mail account, to the importation process for these coffins.*** Indeed, Agent Easter expressly acknowledged his lack of evidence against Mr. Alshdaifat when in his conclusory paragraph on the coffin importation incident, he omitted Mr. Alshdaifat's e-mail from the list of e-mail accounts that:  "[i]n light of the foregoing facts, [will] likely . . . contain evidence . . . [of] smuggling of cultural property and money laundering." (*Id.*, ¶ 35:  listing four other e-mail accounts but ***not*** Mr. Alshdaifat's.)

There is another glaring error in this presentation by Agent Easter relevant to his request to search Mr. Alshdaifat's Yahoo! e-mail account.  A close read of the affidavit astoundingly reveals that the aforementioned ***innocent*** e-mail communication from or to Mr. Alshdaifat occurred ***in an account different from the one that Agent Easter sought to obtain a warrant to search***.  It is easy to see how a reviewing Magistrate might have difficulty uncovering this fact among the multitude of referenced e-mail accounts and inferences strewn throughout the meandering Easter Affidavit.  The Agent confusingly couched the fact that the e-mail correspondence he referred to regarding Mr. Alshdaifat came "from a non-subject e-mail account."[8] (Ex. G, Application, p. 15-16, ¶¶ 24, 28.)  This meant that the Alshdaifat e-mails referenced in ¶¶ 24, 27, and 28 were not from the e-mail account -- salim_iman@yahoo.com -- that Agent Easter sought authorization to search.  Of course, therefore, this evidence contributes

---

[8]     Later in the affidavit, Agent Easter defines the e-mail account he seeks authorization to search, "salim_iman@yahoo.com," as the "ALSHDAIFAT SUBJECT E-MAIL ACCOUNT," thereby distinguishing it from the one mentioned earlier in the affidavit relating to the Egyptian coffin "smuggling" allegations. *See* Ex. G, Application, p. 25, ¶ 53.

nothing towards a showing "that contraband or evidence of a crime will be found in the particular place" sought to be searched. *Gates*, 462 U.S. at 238.

Having determined that this earlier reference to Mr. Alshdaifat involved only innocent activity through an e-mail account not sought to be searched, this reviewing Court must look elsewhere in the affidavit for probable cause to believe that evidence of a crime will likely be found in Mr. Alshdaifat's Yahoo! e-mail account.  The only other place in the affidavit that refers to Mr. Alshdaifat -- and this time, also the Yahoo! e-mail address sought to be searched -- is at ¶¶ 53-55, on pages 25-26 of the Application. (Ex. G.)

Here, the evidence does not remotely satisfy Fourth Amendment standards.  Agent Easter begins his discussion of the "subject" Yahoo! e-mail account of Mr. Alshdaifat by making this either grossly reckless, or intentionally misleading, statement:

> As discussed above, Khouli and Alshdaifat corresponded by e-mail regarding the smuggling of Egyptian coffins from the UAE to the United States.  In those e-mails, Alshdaifat used several e-mail accounts.  A review of the e-mail obtained via the May 13, 2009 warrant shows that one of the e-mail accounts Alshdaifat used in connection with smuggling cultural property was "salim_iman@yahoo.com."

(Ex. G, Application, p. 25, ¶ 53.)

There are a number of troubling aspects about this paragraph.  First, as already explained, the evidence Agent Easter "discussed above" in the affidavit involved innocent activity by Mr. Alshdaifat ***wholly unconnected*** to the importation of the Egyptian coffins.  He had to know this when he made this statement.

Second, Agent Easter stated that Mr. Alshdaifat "used several e-mail accounts" in making the communications referred to in ¶¶ 24, 27, and 28 of the Application.  However, he glaringly failed to identify these accounts.  More dastardly, was what Agent Easter omitted here:  that

**none** of the so-called "several" accounts was the one that he sought authorization to search.  This would be a critical piece of information for a Magistrate judge to know before issuing an intrusive and expansive search warrant into a person's private e-mail.

Third, the statement that Mr. Alshdaifat "used several e-mail accounts" among "those emails," (Ex. G, Application, ¶ 53), discussing the Egyptian coffins, was absolutely false.  Attached hereto at Exhibit I are the emails referred to at ¶¶ 24, 27, and 28 of the Application.  Each of the emails reveal that Mr. Alshdaifat used a single e-mail address: "holyland@vcoins.com."  Agent Easter apparently did not want to identify this e-mail address as the **only** address used by Mr. Alshdaifat in connection with the Egyptian coffins' transaction because a Magistrate would be prompted by that information to question why the Agent was seeking to search an e-mail account **different** from that used in the primary alleged misconduct raised in the Application (and which now has become the subject of the Indictment).[9]  A strong inference can be made that Agent Easter was seeking to confuse his reader into believing that **some** of the earlier e-mail communication came from the e-mail account for which he now sought a search warrant.  This attempt by the Agent to distort the evidence to obtain a search warrant is exactly the kind of conduct that should be deterred.  *See Franks v. Delaware*, 438 U.S. 154, 166 (1978) (the purpose of the exclusionary rule is to "deter official misconduct").

On what, then, did the Agent base his application for a warrant to search Mr. Alshdaifat's personal Yahoo! e-mail account?  In paragraph 54 of the Application, Agent Easter recounted a

---

[9]      The statement by Agent Easter that Mr. Alshdaifat "used several e-mail accounts" when communicating about the offer to sell Egyptian coffins also falsely implied surreptitious activity.  A reviewing Magistrate could infer that the use of multiple accounts was intended to conceal the identity or traceability of the e-mail sender.  Of course, because Mr. Alshdaifat did not use multiple e-mail addresses, this statement had the effect of further misleading the Magistrate.

set of three e-mails on October 2, 2008[10] between Mr. Alshdaifat and Mr. Khouli about a shipment of coins. (Ex. G, Application, ¶ 54, p. 25-26.)  The Agent presciently concluded from the terse exchange between the parties that "Khouli smuggled coins to Alshdaifat in Canada by misrepresenting that coins for which he received payment were being sent for research and avoiding detection by omitting the invoice." (*Id.* at ¶ 55, p. 26.)  This conclusion is made from whole cloth.  However, the Court need not even reach this issue, because on its face this exchange did not make out probable cause to conclude that evidence of the crimes identified in the Application were being committed.  The October 2008 e-mails revealed that Mr. Alshdaifat resided and did business *in Canada,* and therefore, shipments to him in Canada could not be the subject of alleged violations of 18 U.S.C. § 542 ("Entry of goods" to U.S.A.) or § 545 ("Smuggling goods into the United States").

Even if it were relevant, the Agent did not even try to cite authority for believing a crime was being committed against Canadian customs, although he boldly concluded that the

---

[10]     October 2008 was approximately one-and-one-half years before the date of this search warrant Application.  *See United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993) ("While there is no bright line rule for staleness, the facts in an affidavit must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist at the time of the search and not simply as of some time in the past.")  The Agent recounted that this October 2008 e-mail was taken from a previous set of seized e-mails from Mr. Khouli's account on May 13, 2009. (*See* Ex. G, Application, ¶ 53, p. 25.)  A review of that search warrant revealed that the government seized *all* of Khouli's e-mails from a particularly expansive  period from October 1, 2004 to May 13, 2009 -- *a period of almost five years* (*See* Ex. J, Search Warrant Dated 5/13/09 for E-Mail Address windsorant@yahoo.com.)  Therefore, out of five years of Mr. Khouli's e-mails, Agent Easter was only able to find *one* e-mail reflecting anything close to "smuggling" activity between Mr. Alshdaifat and Mr. Khouli.  And even that was only a mail shipment of coins *to Canada.*

29

"correspondence suggests that the value of the coins was also manipulated in order to avoid scrutiny by United States and Canadian customs."[11]   (*Id.*, ¶ 55, p. 26.)

     The e-mail correspondence actually revealed that Mr. Alshdaifat told Mr. Khouli to "declare the coins."  (*Id.*, ¶ 54, p. 26.)  A quick Internet search would have revealed to Agent Easter that Mr. Alshdaifat was a recognized academic numismatist at the time he wrote this Application. (*See* Ex. B, Alshdaifat Decl., 11/21/11, ¶¶ 10, 12.)  Nothing about this brief exchange revealed that it should have been assumed that declaring the coins as "Numismatic items for research" was somehow not true, or whether there was any requirement at all in Canada to "incl[u]de a[n] invoice inside" a mail package. (*Id.*)

     This single e-mail exchange about one shipment of coins ***to Canada*** is woefully insufficient to meet the constitutional standard of a "substantial basis," *Gates*, 462 U.S. at 236, to believe that evidence of the crimes of 18 U.S.C. §§ 542, 545 would be found in Mr. Alshdaifat's e-mail account.

     In sum, Agent Easter obtained a search warrant to invade the personal e-mail account of Mr. Alshdaifat -- to search and seize ***all*** of his e-mails in this account (*see* section below on impermissible "general warrants") -- on the basis of:  (1) an innocent exchange of e-mails advertising the sale of another dealer's Egyptian coffins; (2) from an e-mail account ***different*** from the account sought to be searched; (3) without a single piece of evidence that Mr.

---

[11]     The Agent suggested the parties intended "to avoid scrutiny by United States . . customs." (*Id.*, ¶ 55, p. 26.)  However, nothing about this exchange invoked the jurisdiction of U.S. Customs.  While Mr. Khouli had a business in the United States, his earlier obtained e-mails from a previous search warrant revealed that he sold a lot of coins on consignment from foreign owners.  Such coins would have never entered the United States.  On its face, there was nothing in this exchange to support the Agent's belief that U.S. Customs would be involved in this transaction at all.  Moreover, the Agent does not cite his authority as to what possible crime would be committed on an export from the United States, or what review authority, if any, U.S. Customs had for packages mailed from the United States to another country.  Without this authority, the claims in his Application are meaningless.

Alshdaifat had any communication about the sale or importation of the coffins after he forwarded Mr. Khouli the contact information of Mr. Ramadan, the seller; and (4) the only reference to the Yahoo! personal e-mail account sought to be searched was a single e-mail pre-dating the search warrant Application by almost 18-months, regarding a shipment of coins (not cultural property) *to Canada*; (5) thus, not invoking the crimes identified in the search warrant Application.

For the many reasons articulated here, there was no probable cause to validate the issuance of a search warrant for Mr. Alshdaifat's personal Yahoo! e-mail account, and therefore, the evidence seized pursuant to such warrant should be suppressed. *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought.").

3. The First E-Mail Warrant 3/29/10 Was an Unconstitutionally Overbroad "General Warrant" Because It Sought "All Electronic Mail" in the Account Over a Period of 15 Months

As mentioned above, Agent Easter's affidavit in support of this e-mail search warrant was of the "one-size-fits-all" variety, seeking search warrants not only for Mr. Alshdaifat's personal account, but for *10 others* as well. Attachment A, incorporated by reference in the Warrant, sought the following items to be seized:

> For the period from January 1, 2009 to the date the warrant is signed by the Court [March 29, 2010], *all records and other stored information* pertaining to the categories specified below, in whatever form kept, in the possession or control of Yahoo!, relating to the accounts associated with . . . "salim_iman@yahoo.com" . . .
>
> 1. *All electronic mail* associated with the electronic mail addresses including such subscriber accounts and attachments, whether or not the electronic mail has been retrieved, saved or deleted, and whether contained directly in the e-mail account or in a customized "folder";

31

      2.  ***All chat messages, instant messages, calendar items, contacts, member profiles, buddy lists*** and the content of any Yahoo! online account features such as Yahoo! briefcase, Yahoo! 360, Yahoo! Personals, and Yahoo! Photos, maintained by, or related to the accounts associated with the electronic mail addresses;

      3.  ***All subscriber information*** . . .

      4.  ***All account history* . . .**

      5.  ***All detailed billing records* . . .**

      6.  ***Complete log file of all activity*** relating to the account(s) (including dates, times, method of connection, port, dial-up, and/or location, IP connection log data);

      7.  ***All records of subscriber account preferences***, including but not limited to, the name and Internet address of any "favorite places" or "book-marked" websites specified by the user(s) of the accounts;

      8. ***All web pages***, including any associated links, that were created or maintained by the user(s) of the above-described account.

Ex. G, Attachment A to First E-Mail Warrant 3/29/10.

It is apparent from even the most cursory review that the warrant made no attempt to specify the e-mails, chat messages, instant messages, or even categories of these items, which were to be seized. Instead, it authorized the wholesale seizure of personal content in the account. For that reason, the search warrant was overbroad and, as such, violated the Fourth Amendment.

In *Groh v. Ramirez*, 540 U.S. 1284 (2004), the Supreme Court reviewed a warrant to search a residence which did not include any particularization as to the items to be seized. Noting that "the warrant did not describe the item to be seized ***at all***," the Court concluded it "was so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law." *Id.* at 558 (emphasis in original).

The Second Circuit has similarly found such general warrants authorizing seizure of "all records" to violate the Fourth Amendment. *See, e.g., United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992) ("The instant warrant's broad authorization to search for 'any other evidence relating to the commission of a crime' plainly is not sufficiently particular with respect to the things to be seized because it effectively granted the executing officers 'virtually unfettered discretion to seize anything they saw.'"); *United States v. Bianco*, 998 F.2d 1112, 1115 (2d Cir. 1993) (warrant lacked particularity when it authorized the seizure of all "notes, ledgers, envelopes, papers and records"); *United States v. Buck*, 813 F.2d 588, 590 (2d Cir. 1987) (warrant lacked particularity where it authorized the seizure of "any papers, things, or property of any kind").  Swept up in the general search authorized by this search warrant were personal e-mails between family members, personal family business such as the search to buy a house in Michigan, and religious-related e-mails.

Recently, in *United States v. Cioffi*, 668 F.Supp.2d 385 (E.D.N.Y. 2009), Judge Block from this District ordered the suppression of e-mail seized pursuant to a warrant authorizing the seizure, like here, of the entire contents of a defendant's e-mail account.  As Judge Block noted:

> There was no provision limiting emails to be seized to those containing evidence of the crimes charged in the indictment, or indeed, of any crime at all.

*Id.* at 389.

As courts increasingly have recognized, the unique nature of electronically stored information does not relieve the government of its constitutional obligation to particularize the materials it has probable cause to search for among the seized items.  Indeed, the Ninth Circuit recently offered guidance to courts "in the proper administration of search warrants and grand jury subpoenas for electronically stored information, so as to strike a proper balance between the

government's legitimate interest in law enforcement and the people's right to privacy and property in their papers and effects, as guaranteed by the Fourth Amendment." *United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989, 994 (9th Cir. 2009) (*en banc*). The court in that case outlined specific steps the government should take to avoid an overly broad search of computer data. Among other things, the court cautioned against an over-reliance on hypothetical risks associated with electronic data: "While it is perfectly appropriate for the warrant application to acquaint the issuing judicial officer with the theoretical risks of concealment and destruction of evidence, the government must also fairly disclose the *actual* degree of such risks in the case presented to the judicial officer." *Id.* at 998 (emphasis in original). Similarly, the court stated that the warrant should provide for an initial review by computer personnel, rather than the prosecution team, in order to "segregate materials not the object of the warrant for return to their owner." *Id.*

In this case, the warrant failed to include ***any*** of these safeguards. The affidavit is support of the First E-Mail Search Warrant 3/29/10, for example, did not even attempt to convey to the Magistrate judge the actual quantum of risk associated with Mr. Alshdaifat's personal e-mail account. Instead, it relied upon boiler-plate and conclusory allegations that evidence of the alleged crimes would be found among the voluminous mass of e-mails sought to be searched.

Moreover, on the facts explained in the section above, the Agent actually had express information that Mr. Alshdaifat used a different e-mail account to conduct his Internet business, "holyland@vcoins.com." Thus, he had specific reasons to believe that the e-mail he sought authorization to search, "salim_iman@yahoo.com," was a more personal e-mail.

Because the First E-Mail Warrant 3/29/10 did not incorporate Agent Easter's Affidavit in Support of the Search Warrant Application and did not even include on its face the crimes that

were being investigated, its overbreadth was even greater than that of the average general e-mail warrant examined by recent courts.  Therefore, when the materials produced by Yahoo! employees were "in turn searched by special agents of the United States Immigration and Customs Enforcement," (Ex. G, Search Warrant, cover page), there is no evidence that these agents had any direction about what they were searching for. *See George*, 975 F.2d at 76 ("A sufficiently specific affidavit will not itself cure an overbroad warrant.  Resort to an affidavit to remedy a warrant's lack of particularity is only available when it is incorporated by reference in the warrant itself and attached to it.") (citation omitted).

The United States Supreme Court, in *Groh v. Ramirez*, 540 U.S. at 557-58, recently affirmed this position of the Second Circuit.  In *Groh*, the Supreme Court held that a putative warrant, which was labeled a "warrant" and signed by a judicial officer, but which failed to state with particularity the things to be seized, was "so obviously deficient that  . . . the search [was] 'warrantless' within the meaning of [the] case law." *Id.* at 558.  The Court so held, notwithstanding the fact that the unaccompanied affidavit stated with particularity the items to be seized. *Id.*  The Court explained that: "[t]he presence of a search warrant serves a high function . . . and that high function is not necessarily vindicated when some other document, somewhere, says something about the objects of the search." *Id.* at 557.[12]

Here, the government did not even bother to include on the warrant any general references to federal criminal statutes being investigated.  An executing ICE agent could have

---

[12]    The *Groh* Court recognized that "a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Id.* at 557-58.  Here, no appropriate words of incorporation are found on the face of the warrant and no information has been provided to determine what accompanied the warrant at the time the electronic materials were "searched by special agents of the United States Immigration and Customs Enforcement." (Ex. G, Search Warrant, cover page.)

believed s/he was looking for evidence of immigration fraud or terrorist offenses -- there was absolutely no description of what offenses were alleged here.  The federal case law provides ample precedent holding that general references to federal statutes are insufficient to satisfy the particularity requirement of the Fourth Amendment, let alone no references to alleged violations at all. *See, e.g., United States v. Roche*, 624 F.2d 6, 8 (1st Cir. 1980) (affirming grant of suppression and rejecting government's claim that warrant was sufficiently particular because it limited the search to evidence in violation of the federal mail fraud statute); *Voss v. Bergsgaard*, 774 F.2d 402, 405 (10th Cir. 1985) (affirming decision to return all seized evidence to defendant: "Even if the reference to section 371 is construed as a limitation, it does not constitute a constitutionally adequate particularization of the items to be seized); *Rickert v. Sweeney*, 813 F.2d 907, 909 (8th Cir. 1987) (reference to conspiracy statute, 18 U.S.C. § 371, "too broad in scope to provide any real limitation on the warrant") (citing *Voss, supra*); *United States v. Maxwell*, 920 F.2d 1028, 1033 (D.C. Cir. 1990) (reference to 18 U.S.C. § 1343 (wire fraud) insufficient to satisfy the particularity requirement).  *See also George*, 975 F.2d at 76  ("Mere reference to 'evidence' of a violation of a broad criminal statute or general criminal activity provides no readily ascertainable guidelines for the executing officers as to what items to seize") (collecting cases).  The facts of this case are more egregious than any of these other cases because the First E-Mail Warrant 3/29/10 contains ***no specified criminal violations at all and no words of incorporation of the affidavit in support of the application.***

The gross failures of this Warrant to have any limitations at all reduces it to a general warrant.  It is obvious that a general warrant authorizing the seizure of "evidence" without specifying the particular items to be searched, without mentioning the crimes or criminal

activities that the executing agents should search for, coupled with the expansive period of a search of more than 15 months, should be void under the Fourth Amendment.

    4.      The "Good Faith" Exception in *Leon* Cannot Save the First E-Mail Warrant 3/29/10 Because the Magistrate Was Knowingly or Recklessly Misled, the Application is Completely Lacking in Indicia of Probable Cause, and Is So <u>Facially Overbroad That Reliance On It Is Unreasonable</u>

In *United States v. Leon*, 468 U.S. 897, 919-21 (1984), the Supreme Court stated that the exclusionary rule did not apply to evidence seized in objectively reasonable reliance on a warrant subsequently declared invalid.  "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance." *George*, 975 F.2d at 77.

Here, the "good faith"  exception does not apply for several reasons.

First, Agent Easter's Affidavit in Support of the Warrant was recklessly misleading to the Magistrate.  As explained at length above, the Agent sought a massive amount of electronic data in the application, seeking to obtain "all records" searches of eleven different e-mail accounts from several different e-mail providers.  In the midst of this already voluminous request, the information he provided as part of the probable cause showing related to Mr. Alshdaifat's e-mail account was couched in confusing terms that it made it difficult for a reviewing Magistrate to unbundle.  Specifically, the Agent hid from the Magistrate that none of the e-mail exchanges from Mr. Alshdaifat relating to the Egyptian coffins' transaction came from the e-mail account that the Agent sought to search. (Ex. G, Easter Affidavit in Support of Warrant, ¶¶ 24, 27, 28.) The Agent further falsely stated that Mr. Alshdaifat "used several e-mail accounts" in communicating with others on the Egyptian coffins transaction. (*Id.* at ¶ 53.)  Of course, the Magistrate should have been told that, in fact, all communications from Mr. Alshdaifat came from a single e-mail account -- but ***not*** the one which the agent sought to search.

Second, the First E-Mail Warrant Application was absolutely lacking in probable cause. There is no need to recount again here the utter lack of evidence included in the Easter Affidavit to believe that Mr. Alshdaifat was committing violations of 18 U.S.C. §§ 542 and 545, and certainly none to connect to his personal Yahoo! e-mail account. Agent Easter produced a single e-mail, dated 18 months prior to the warrant request, about a shipment of coins to Canada. This is plainly insufficient to make a constitutional probable cause finding to search.

Third, the warrant was so overbroad that it was, in essence, "warrantless." In *Cioffi*, Judge Block denied the government's *Leon* application for a very similarly drafted warrant and concluded that the all-inclusive requests converted that warrant to a "general warrant" that could not be saved by any claims of "good faith" by executing agents. *Cioffi*, 668 F.Supp.2d at 396-97.

For all of the above reasons, the Court should decline to invoke the *Leon* exception to the exclusionary rule for the government's defective First E-Mail Warrant 3/29/10.

    5.    In the Alternative, This Court Should Conduct a *Franks* Hearing to Test the Accuracy of Agent Easter's Statements in the Affidavit

If the Court is uncertain about any of the above analysis and conclusions, it should conduct a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to test Agent Easter's veracity on his several claims about the use of Mr. Alshdaifat's Yahoo! e-mail account.

    **B.**    **The Second E-Mail Warrant 1/25/11 Was Based on the Same Allegations Made in the First E-Mail Warrant Application and On Tainted Evidence Obtained From That Unlawful Search, and Therefore, the E-Mail Evidence Seized Pursuant to This Second Warrant Should Also Be Suppressed**

The government sought and obtained a Second E-Mail Warrant 1/25/11 to seize additional e-mail and other content messages from Mr. Alshdaifat's Yahoo! personal e-mail account, "salim_iman@yahoo.com." (*See* Ex. H, Second E-Mail Search Warrant, Attachment A, Affidavit in Support of Warrant, 1/25/11.) Through this warrant, the government seized Mr.

Alshdaifat's e-mail content for the period dating from January 1, 2009 to the date of the warrant, January 25, 2011, or approximately a two-year period.  This Second E-Mail Warrant was a mere replica of the first, except for two additions:  (1) information obtained from an e-mail seized pursuant to the First E-Mail Warrant 3/29/10, which would be tainted, and thus could not be considered in a probable cause analysis for the Second E-Mail Warrant (Ex. H, Affidavit in Support, at ¶ 17, pp. 11-12); and (2) information related to an incident at Detroit Metro Airport where Mr. Alshdaifat hand-carried coins into the United States from an international flight and had hired a private Customs broker to declare and clear the coins before he arrived, and then again declared the coins and presented their invoices at the airport upon his arrival. (*Id.* at ¶ 18, p. 12-13).  This latter event is more fully explained in the section, *infra*, related to Mr. Alshdaifat's motion to suppress evidence obtained from a search of his residence.

If the Court grants Mr. Alshdaifat's motion to suppress evidence from the First E-Mail Warrant 3/29/10, the Second E-Mail Warrant must also fail because the government could not rely on tainted evidence as the basis for probable cause in the subsequent warrant.  *See Brown v. United States,* 422 U.S. 590, 597-99 (1975); *Wong-Sun v. United States*, 371 U.S. 471, 487-88 (1963).  The Second E-Mail Warrant 1/25/11 also is an impermissible "general warrant" for the reasons cited, *supra*, and must fail on that ground as well.  Finally, again for reasons previously made above, the government's Second E-Mail Warrant also cannot be saved under *Leon's* good faith exception.

## IV.

### THE GOVERNMENT'S SEARCH WARRANT FOR MR. ALSHDAIFAT'S RESIDENCE WAS CONSTITUTIONALLY DEFECTIVE BECAUSE IT WAS BASED ON TAINTED EVIDENCE; THE NON-TAINTED EVIDENCE RELIED UPON IN THE AFFIDAVIT FAILED TO SUPPORT A PROBABLE CAUSE FINDING; THE WARRANT WAS IMPERMISSIBLY OVERBROAD, AND THE EXECUTING AGENTS' SEIZURES FAR EXCEEDED THE SCOPE OF THE WARRANT

On the date of Mr. Alshdaifat's arrest, on July 13, 2011, the government executed a search of his home in Orchard Lake, Michigan pursuant to a search warrant issued by Magistrate Judge R. Steven Whalen in the Eastern District of Michigan. (*See* Ex. K, Search Warrant, Attachments A and B, Affidavit in Support by Special Agent Pietro Ciranni, 7/12/11) (hereinafter the "Residence Search Warrant").  This warrant application had many of the same defects identified above in the E-Mail Search Warrants.  There is no need to re-count those here. Because the bulk of information provided the Magistrate in the Residence Search Warrant Affidavit is the same as that included in the E-Mail Warrants affidavits, in addition to tainted evidence obtained as fruits of those seizures, the government cannot sustain a showing of probable cause to uphold the search and seizure of items from Mr. Alshdaifat's residence. However, for the sake of completeness, we address below additional reasons to suppress evidence from the Michigan search.[13]

---

[13]     The Fourth Amendment issues related to the search of Mr. Alshdaifat's home requires a choice-of-law determination because the Residence Search Warrant was issued and supervised by a federal magistrate judge in the Eastern District of Michigan, within the jurisdictional boundaries of the Sixth Circuit, although the Indictment was returned and this case is pending in the Eastern District of New York within the Second Circuit.  As a threshold question, then, this Court must determine which law applies to the suppression of evidence derived from constitutional violations occurring in a different circuit.  Case law discussing this issue at the appellate level is scant, but numerous district courts have held that "the governing law should be

A.   **The New Allegation in the Residence Search Warrant Affidavit that Mr. Alshdaifat "Smuggled Ancient Coins Into the United States" is Based on Recklessly or Intentionally False Statements**

The only significantly new and possibly untainted piece of information in the Residence Search Warrant Affidavit by I.C.E. Agent Ciranni involved an incident with Mr. Alshdaifat at the Detroit Metro Airport on December 20, 2010.  This incident is largely falsely reported, or glaringly omits critical information by the Agent.  (*See* Ex. K, ¶¶ 18-20, pp. 9-10.)

The Agent's account of this incident is emblematic of the reckless way the government conducted this investigation and how they repeatedly misreported information to force the "facts" to fit their theory.  On its face, this purported "smuggling" incident does not make any sense.   From the Agent's own (inaccurate) account, Mr. Alshdaifat was "smuggling" coins even though he had retained a private customs broker to pre-clear the entry of the coins prior to his arrival (¶ 18); on his arrival at Detroit Metro Airport he had copies of the prepared entry forms by the retained private customs broker (*id.*); the pre-cleared invoices actually showed a ***greater*** number of coins than that which Mr. Alshdaifat actually brought back with him (invoices showed 900 Byzantine coins; he actually possessed only 570, so his pre-clearance declaration actually over-declared coins) (*id.,* ¶ 19); the so-called "undeclared" coins were "64 Roman-Egyptian coins," valued only at $20 each, as compared to the over-declared coins, which were

---

that of the place where the [government conduct] occurred." *United States v. Restrepo*, 890 F.Supp. 180, 191 (E.D.N.Y. 1995); *see also United States v. Ozuna*, 129 F.Supp.2d 1345, 1354 (S.D. Fla. 2001), *aff'd* 48 Fed. Appx. 739 (11th Cir. 2002) ("The few federal cases that have addressed a similar choice-of-law issue in the criminal context have adopted a *lex loci* (*i.e.,* 'the law of the place' of the conduct) approach"); *United States v. Longo*, 70 F.Supp.2d 225 (W.D.N.Y. 1999) (same).  Accordingly, this authority suggests that the Court apply the law of the Sixth Circuit in determining whether the search and seizure executed at the Alshdaifat residence was constitutionally valid.  Because a review of the Sixth Circuit law on these general constitutional issues reveals little divergence from existing Second Circuit law, we will continue to cite Second Circuit authority except in those cases where the Sixth Circuit law diverges or is more on-point.

41

valued at $250 each, or ten times the amount of the allegedly undeclared coins (*id.*). The Agent also recounted how Mr. Alshdaifat later *voluntarily* "presented [to the agent] two packages of similar coins he received by international post." (*Id.*, ¶ 20.) In short, the Agent's own incomplete version of the incident does not convey the conduct of a "smuggler."

But the Court should not rely on the statements in Agent Ciranni's affidavit because the details of Mr. Alshdaifat's hand-carried importation at Detroit Metro Airport were quite different from what the Agent reported, despite the fact that he was clearly aware of them.

Based on the documentary evidence attached to the Mazurek Declaration to the Notice of Motions, at Exhibits L to U, Mr. Alshdaifat took the following exhaustive steps to ensure that he properly imported the ancient coins he purchased in Dubai: (1) before he left the United States to travel to the U.A.E. to purchase the coins, he hired a private Customs brokerage firm, Nippon Express USA Inc., to submit pre-entry importation documents; (2) before he left on his trip, he also personally contacted by telephone several Customs and Border Patrol ("CBP") agents so that he could directly notify CBP of his intention to import ancient coins and confirm how to properly declare and import the coins; he informed his hired broker of the name and telephone number of the agent who personally assisted him at CBP (Carol Pilon); (3) he inquired of his privately retained broker how to handle a change in the reported quantity or type of ancient coins, if once he arrived in Dubai he wanted to modify his purchase; (4) he produced the corrected invoices to his customs broker upon his arrival in Detroit (as stated above, these invoices show that he actually bought fewer coins, not a situation where he initially reported fewer coins than he actually imported; the reverse was true ó he reported for pre-entry clearance a greater value and quantity of coins than he imported); (5) he declared the ancient coins on his in-flight baggage claim form *before* landing in Detroit; (6) he showed his invoices and coins

upon initial inspection by Immigration and Customs inspectors at Detroit Metropolitan Airport; and (7) he *voluntarily* produced two additional packages of ancient coins that he originally received by international mail earlier that month – packages which already had cleared Customs.

These facts hardly reflect the actions of a smuggler.  Mr. Alshdaifat did much more than the average importer in preparing his Customs entry.  In addition to hiring a broker, he *personally* reached out to Customs to inform them of his upcoming trip and intended importation.  He repeatedly declared his import entry:  sought pre-entry clearance for his hand-carry with a Customs broker before he left on his international trip; declared his merchandise on the plane *en route* to the United States by reporting it on the in-flight declaration form; and presented the imported coins and invoices once he arrived.  The fact that the quantity and type of his coin purchases were changed once he actually saw the product on December 19, 2010 in Dubai did not alter his intent to properly declare and identify the purchased coins.  Mr. Alshdaifat immediately produced the corrected invoices to his retained customs broker and the inspecting agents upon his return to the United States.

In conversations with the Customs broker who handled the hand-carry importation for Mr. Alshdaifat, I learned that it is not uncommon for a person to have to amend a pre-entry clearance with new invoices on the person's return to the United States because the traveler decided to alter the quantity or type of purchases for import after the person left the country. (*See* Mazurek Decl., at ¶ 5.)  In sum, Mr. Alshdaifat complied with all Customs regulations in seeking to declare his hand-carried coins for import on December 20, 2010.

If the Court is inclined to consider this allegation as central to a probable cause determination, Mr. Alshdaifat seeks a *Franks* hearing to test the veracity of these contested representations by Agent Ciranni. *Franks*, 438 U.S. at 171.

The Agent's rendition of the incident at Detroit Metro Airport with Mr. Alshdaifat should not contribute to a probable cause showing to invade his home because it does not suggest crimes involving violations of Customs laws or the National Stolen Property Act.

**B.     Attachment B to the Residence Search Warrant Was Impermissibly Overbroad**

Attachment B to the Residence Search Warrant (Ex. K) lacked important particularity to save the Warrant.[14]  First, the Attachment failed to include any limiting time period, and therefore, exceeded the scope of information provided in Agent Ciranni's supporting affidavit. The attachment also failed to identify any specific names of cultural property sources or customers, names of businesses, account names for bank or other financial records, or any information or direction at all as to how executing agents should identify items "which were evidence of the receipt, transfer, sale and/or disposition of works of art or antiquities that were *illegally imported* into the United States." (Ex. K, Attachment B) (emphasis added).

Moreover, the Warrant's Attachment B contained basically no limitation on the types of documents within each category that could be seized, and failed to explain how they might be related to the specifically alleged criminal activity.  As numerous courts have held, the failure to sufficiently particularize a warrant with such limiting details renders a warrant unconstitutionally overbroad.

---

[14]     Even with the overbroad requests in Attachment B, the Residence Search Warrant reveals how grossly defective the E-Mail Warrants were in this case.  A review of the Residence Search Warrant shows that it included many features missing in the E-Mail Warrants:  (1) the basis for the search under Fed. R. Crim. P. 41(c); (2) the specific sections of the federal criminal code to which the search was related and a written description of the alleged offense conduct; (3) express reference and incorporation of the supporting affidavit, and confirmation that it is to be attached to the warrant for use by the search's executing agents. (*See* Ex. K.)  As explained in the section, *supra,* all of this constitutionally necessary information was omitted from the E-Mail Warrants in this case.

For example, in *United States v. Leary*, 846 F.2d  592 (10th Cir. 1988), the defendants were indicted for conspiring to violate the Export Administration Act.  During the investigation, a search was executed at their offices.  The warrants authorized the seizure of a broad category of documents, with the specified limitation that they showed evidence of violations of the Arms Export Control Act and the Export Administration Act.  The Tenth Circuit held that the search was invalid and ordered suppression of all of the evidence seized. *Id.*

First, the court noted that the warrant was overbroad on its face.  The only limitations placed on the items to be seized were that they must fall within a list of documents typically kept by export companies, and that the documents had to relate to the purchase, sale and illegal exportation of materials in violation of federal export laws.  Neither limitation was found to be meaningful.  The Tenth Circuit held that the detailed list of types of documents to be seized did not cure the overbreadth of the warrant:  "Nor did the list of business records to be seized provide any meaningful limitation on the [ ] search.  The warrant encompassed virtually every document that one might expect to find in a modern export company's office.  Again, the Fourth Amendment requires more." *Id.*, 846 F.2d at 602.

Similarly, in this case, the list of documents set forth in Attachment B of the Residence Search Warrant failed to provide any meaningful limitation on the search and seizure of items from Mr. Alshdaifat's home.  Indeed, it is hard to fathom how searching agents would be able to divine how "antique coins and other antiquities" found at the residence would be "evidence of the receipt, transfer, sale and/or disposition of works of art and antiquities that were illegally imported into the United States in violation of the Customs laws." (Ex. K, Attachment B, Item 1.)  Incredibly, no further direction was given in the Warrant or its Attachment.  The result of this directive was obvious:  the searching agents simply ***seized every coin in the house, over***

45

**7,000 of them, and anything that looked like an antiquity, including Mr. Alshdaifat's wife's collection of trinkets purchased from the QVC home shopping network.**  As the *Leary* court stated, "the Fourth Amendment deserves more."

The rest of the categories of items in the Attachment were simply "all records" dragnets: (1) all "business records reflecting the importation, purchase and sale of cultural property"; (2) all "correspondence . . . reflecting transactions involving cultural property"; (3) all "bank records, financial records, letters of credit, and consumption entry forms" without limitation to a name of business, type of business, or any specific entity or persons at all; (4) all "importation records" without limitation to cultural property or coins; and (5) all "computers and computer records." (Ex. K, Attachment B.)  These categories were not limited in *any* way:  not by relevant time period; not by suspected targets; not by suspected businesses or identified artifacts; not by anything.

As in *Leary*, the government simply identified items or documents one would expect to find at a coin or antiquities' business, and it listed them all.  This failure to particularize should not withstand Fourth Amendment scrutiny. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (the Fourth Amendment's particularity requirement is meant to prevent the "general, exploratory rummaging in a person's belongings").

### C.   The Computer Part of the Residence Search Warrant Was Likewise Unconstitutionally Overbroad and the Affidavit Lacked Probable Cause to Search All Electronic Files

In addition to the physical items seized at Mr. Alshdaifat's residence, the digital items were likewise seized without adherence to the Fourth Amendment's particularity requirement. With respect to the extensive list of electronic equipment taken from the Alshdaifat residence -- including three personal computer hard drive towers, two cell phones, one digital camera, one

46

video camera, and one laptop computer, and various compact discs (*see* Ex. V, Custody Receipts

for Seized Property) -- the Supporting Affidavit offers no probable cause showing other than an

undercover agent who obtained access to the house as a prospective buyer, and observed

"Alshdaifat work[ing] on a computer.  On the computer screen was an image of coins." (Ex. K,

Affidavit in Support of Residence Warrant, ¶ 30, p. 12.)  In his affidavit, Agent Ciranni did not

identify any description of the computer observed, whether the computers to be seized should be

limited to the identified "home office" area of the residence, or if the computer observed was a

lap top or desk top computer.  Instead, the searching agents simply collected *all*  of the

computers found at the home.

        We refer the Court to those same authorities recited in the section above ordering

suppression of general digital searches and the growing list of sanctions that courts are imposing

on unrestricted searches of computer files. *See generally, United States v. Comprehensive Drug

Testing, Inc.,* 473 F.3d 915, 944 (9th Cir. 2006) (quoting one of the district court opinions:

"What happened to the Fourth Amendment?  Was it repealed somehow?").

        The government has yet to produce evidence seized from the electronic equipment taken

from Mr. Alshdaifat's home.  If the government seeks to admit this evidence at trial, he reserves

the right to contest the means and methods of the government's digital access to the electronic

files pursuant to controlling Fourth Amendment precedent (including the use of various search

protocols and other forensic analysis techniques) relating to digital evidence, before this

evidence may be used at trial.

47

**D.      Agents Who Executed the Residence Search Warrant Disregarded the Terms of the Warrant and Seized Many Items Beyond Its Scope, Including the Indiscriminate Seizure of Mr. Alshdaifat's Entire Inventory of Ancient Coins**

The most significant category of items on the Residence Search Warrant's Attachment B was Item 1, which authorized searching agents to seize all "items (including antique coins and other antiquities) which are evidence of the receipt, transfer, sale and/or disposition of works of art or antiquities that were illegally imported into the United States in violation of the Customs laws." (Ex. K, Attachment B, Item 1.)  While the Warrant's Attachment specifically limited the items to be seized to those "which are evidence of . . . art or antiquities that were illegally imported," the searching agents took everything -- every last coin and trinket in the house.  (*See* Ex. V, Custody Receipts for Seized Property.)  There was no attempt to connect these items with evidenc that they were illegally imported -- none at all.

The agents seized several thousand ancient coins, removing them from their individual holders where they were being kept, and tossing them in large plastic evidence bags -- mixing all of the coins indiscriminately and endangering their fragile state. (*See* Ex. A, Alshdaifat Decl., 4/30/12, at ¶ 29.)  They grabbed boxes of trinkets, some of which were modern day QVC-purchased items (line items 011-012).  They grabbed modern jewelry (line item 014 from the basement safe); $4,388 in cash from the home (line item 053); cameras, cell phones, compact discs (line items 020-022, 048-050); and documents from the car parked in the driveway (line item 030). (*See* Ex. V, Custody Receipts.)  All of these things were seized despite not being listed on the already overbroad categories of items on the Search Warrant Affidavit B.

The agents seized items throughout the family home despite the fact that Agent Ciranni, in his Affidavit, referred only to one place in the house which gave rise to probable cause for the places to search.  His Affidavit specified that Mr. Alshdaifat revealed to an undercover agent

that he had a "'home office' downstairs." (Ex. K, Affidavit in Support of Residence Warrant, ¶ 30.) Despite this fact, the agents executed a search of the entire house. (*See* Ex. V, Custody Receipts of Seized Property, indicating items seized from kitchen and by floor of upstairs fire place).

These agents also knew better than to conduct such an indiscriminate search and seizure. This same lead investigating team of agents had executed a search warrant at co-defendant Morris Khouli's business about a year before (in February 2010), and seized his entire inventory of merchandise. (Mazurek Decl., at ¶ 6.) Eventually, the agents conceded that the merchandise seized was not evidence of any crimes and returned all of the seized items from the Khouli shop. (Mazurek Decl., at ¶ 7.) Lightning apparently struck twice here. Of course, agents might make inadvertent mistakes, but when the same excessive seizures occurred a second time, as they did at Mr. Alshdaifat's home, as part of the ***same*** investigation, it cannot be the result of unknowing error. This investigative team knew better, but they committed the same wrong twice anyway. Obviously, good faith conduct is not applicable here.

As with Mr. Khouli's merchandise, the government already has conceded that not a single coin in the seizure of Mr. Alshdaifat's complete inventory of ancient coins was evidence of any crime, and it returned the full set of items seized at his home. (Mazurek Decl., at ¶ 8.)

Courts have instructed that such disregard of a warrant's scope and limitations, as evidenced here, requires suppression of all seized materials. *See United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000). "Government agents flagrantly disregard the terms of a warrant so that wholesale suppression is required [ ] when: (1) they effect a widespread seizure of items that were not within the scope of the warrant, and (2) do not act in good faith." *Id.* at 140 (internal citations and quotations omitted).

49

The complete round-up of every coin possessed by Mr. Alshdaifat in his home certainly qualifies as an impermissible õgeneral search,ö which has variously been defined as [a] õwide-ranging exploratory search,ö *Maryland v. Garrison*, 480 U.S. 79, 84 (1987), and õindiscriminate rummaging,ö *George*, 975 F.2d at 75.  Given the earlier related indiscriminate search and seizure of Mr. Khouli's storefront and the way the searching agents at Mr. Alshdaifat's home ignored the limitations once again in his warrant, there are sufficient reasons for this Court to conclude that the agents here did not act in õgood faithö in conducting the search of Mr. Alshdaifat's home.  Accordingly, this Court should suppress all items seized during this egregiously excessive search.

In any event, because of the widespread seizure of all coins and antiques by the searching agents, this Court should, at the very least, grant an evidentiary hearing to allow Mr. Alshdaifat to inquire further about the agentsø intentions and decision-making during the execution of their search.

Finally, given the totality of these facts, the government cannot sustain its burden under *Leon* that the agents executed the house search in good faith.

**V.**

**POST-ARREST STATEMENTS BY MR. ALSHDAIFAT SHOULD BE SUPPRESSED BECAUSE THE GOVERNMENT VIOLATED HIS FIFTH AND SIXTH AMENDMENT RIGHTS IN CONDUCTING A CUSTODIAL POST-ARREST INTERVIEW OF HIM AT HIS HOME OUTSIDE THE PRESENCE OF COUNSEL, WHO ALREADY HAD INFORMED THE INQUIRING AGENT THAT MR. ALSHDAIFAT WAS REPRESENTED AND THAT ALL FUTURE COMMUNICATIONS SHOULD BE WITH COUNSEL**

On July 13, 2011, Mr. Alshdaifat was interrogated outside the presence of counsel while under arrest at his home under the following circumstances:  (1)  after more than a dozen visibly armed agents raided his family's house in the early morning hours, waking his wife and four daughters (all under the age of 10) from sleep; (2) after witnessing his wife and young daughters being paraded through the house under armed guard; (3) after being handcuffed for long stretches of time and seeing his wife in handcuffs; (4) after being separated from his wife and the children, and knowing that his wife was also separated from the children; and (5) and after being stricken with a migraine headache during all of this commotion. (Ex. A, Alshdaifat Decl., 4/30/12.)  In addition, Mr. Alshdaifat requested the opportunity to call his lawyer, and was denied. (*Id.*)  Under these circumstances, Mr. Alshdaifat did not voluntarily waive his right to have counsel present at his post-arrest interview and his statements were far from voluntary.

Moreover, because at the time of his arrest, Mr. Alshdaifat was already under indictment in the Eastern District of New York and represented by counsel on matters related to that indictment, the government also violated his attached Sixth Amendment right to counsel.

51

### A. Mr. Alshdaifat's Fifth Amendment Rights Were Violated

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled to in any criminal case to be a witness against himself."  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established procedural safeguards to protect individuals from the coercive effects of a custodial interrogation.  Thus, before a suspect may be questioned in custody, law enforcement officers must advise the individual of his right to remain silent and his right to counsel, and there must be a knowing and voluntary waiver of those rights. *Id.* at 444.  *Miranda* further held that it was the government's burden to show that an individual "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel," *id.* at 475, before statements elicited during custodial interrogation should be admitted.

In *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981), the Court went further and held that once an individual invoked his right to counsel, all interrogation must cease and the police are forbidden form approaching him for additional interrogation "until counsel has been made available to him," and is present for the questioning.

The government bears a "heavy burden" of proof to show that the defendant understood the rights and knowingly waived those rights. *Tague v. Louisiana*, 444 U.S. 469, 470-71  (1980); *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (holding that the prosecution bears a "great" burden to prove a valid waiver).  "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995).  In assessing the validity of a waiver, courts examine the totality of the circumstances surrounding the interrogation. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

52

In order to determine whether a statement was made voluntarily, the court must first determine whether the statement was the product of coercion on the part of law enforcement. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Next, the court looks to the defendant's mental state and other factors to determine if his will had been overborne by the actions of law enforcement. *See Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988).

In this case, there is no question that Mr. Alshdaifat was in custody at the time he was questioned on the morning of July 13, 2011. (Ex. A, Alshdaifat Decl. 4/30/12, at ¶ 7 (handcuffed at beginning of police raid); ¶ 11 (separated from family); ¶ 12 (informed directly by officer that he was under arrest).)

Mr. Alshdaifat also asserted his right to consult counsel before any questioning began. (*Id.* at ¶ 12 (wife instructed officers to allow him to call lawyer; she also told him directly to call lawyer); ¶ 15 ("I asked to call my lawyer and my request was denied;" this happened before the interviewing agent, Pietro Ciranni, arrived at the house); ¶ 21 (later, again "emphasized to Agent Ciranni that I wanted to contact my lawyer"). The government has indicated (but not yet produced) that Mr. Alshdaifat signed a written *Miranda* waiver form at some point on July 13, 2011. However, even if Mr. Alshdaifat responded to law enforcement questioning, after already invoking his right to counsel, there is no valid waiver and the statements should be suppressed. *Edwards*, 451 U.S. at 484. This rule set forth in *Edwards* was "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

Finally, the circumstances confronting Mr. Alshdaifat, and his own mental state, at the time of his custodial interrogation do not prove that he gave a knowing and intelligent waiver of counsel, and that his statements were voluntary. As stated above, federal agents conducted a

massive raid of Mr. Alshdaifat's home.  They came in large number and in a show of force with firearms visible. (Ex. A, Alshdaifat Decl., 4/30/12, at ¶¶ 7-8.)  They immediately handcuffed him and his wife, basically at the front door of the home. (*Id.* at ¶ 7.)  Several armed officers ran upstairs to the four children's bedrooms (ages 2-9), woke them, and while still "in their pajamas, [and] being surrounded by agents with machine guns, [they were] led to walk down the front stairs of [Mr. Alshdaifat's] home like prisoners." (*Id.* at ¶ 8)  Of course, this was all done in plain view of Mr. Alshdaifat, who remained handcuffed when his children first saw him. (*Id.*)

Mr. Alshdaifat was then separated from his family. (*Id.* at ¶¶ 9, 11.)  He "was not sure what happened to [his] children, or who was caring for them, during this time." (*Id.* at ¶ 9.)  He "had difficulty breathing at times and developed a migraine headache." (*Id.* at ¶ 13.)

As explained above, he was twice denied his requests to call his previously retained lawyers. (*Id.* at ¶¶ 15, 21.)  He was denied his request to see "paperwork" regarding the officers' authority to be in his home. (*Id.* at ¶ 15.)  Under all of these circumstances, Mr. Alshdaifat "did not feel that [he] could refuse to speak with the officers." (*Id.* at ¶ 22.)

Because Mr. Alshdaifat invoked his Fifth Amendment right to counsel, and did not subsequently knowingly and intelligently waive that right, any response to custodial interrogation should be suppressed.  The government also cannot meet its burden to show that these post-arrest statements were made voluntarily, free of police coercion.

### B.  Mr. Alshdaifat's Sixth Amendment Rights Were Violated

Suppression of Mr. Alshdaifat's post-arrest statements is also warranted because his Sixth Amendment right to counsel was violated.  At the time of Mr. Alshdaifat's arrest on July 13, 2011, an Indictment was already pending in the Eastern District of New York.  According to the

docket in this case, the Indictment was returned on May 4, 2011 -- more than two months prior to his arrest. 11 Cr. 340 (ERK), Dkt. No. 10.

It is undisputed that where, as here, the defendant has been indicted at the time of his arrest, his Sixth Amendment right to counsel has attached. *See Kirby v. Illinois*, 406 U.S. 682, 688-90 (1972) (noting the firmly established principle that the Sixth Amendment right to counsel attaches upon the initiation of adversarial judicial proceedings). The Sixth Amendment prohibits the government from interrogating or eliciting information in the absence of counsel once an individual has been indicted. *Massiah v. United States*, 377 U.S. 201, 206 (1964), and any statements made by the defendant to law enforcement officials are inadmissible unless they are shown to be the product of a voluntary, knowing and intelligent waiver of the defendant's Sixth Amendment rights. *See Patterson v. Illinois*, 487 U.S. 285, 292, 292 n. 4 (1988); *Michigan v. Jackson*, 475 U.S. 625, 630 (1986).

In this case, the government cannot show such a waiver. The facts here reveal that the interrogating agent, I.C.E. Agent Pietro Ciranni, was well aware that Mr. Alshdaifat was represented by counsel at the time he sought to interview him post-indictment. Indeed, two different attorneys -- Michael McCullough, Esq. and Robert Forrest, Esq. -- specifically contacted Agent Ciranni to inform him that Mr. Alshdaifat was represented by counsel and that future communications should only be with counsel. (*See* Ex. C, McCullough Decl., ¶ 7: "On Wednesday, December 29, 2010, I sent an initial email to Agent Ciranni to introduce myself and attached a letter from Mr. Alshdaifat indicating that he retained me to represent him on the matter of his detained coins."; attaching authorization letter from Mr. Alshdaifat to speak to counsel; Ex. D, Forrest Decl., ¶ 8: "I called S.A. Ciranni by telephone several times. My reason for calling him was to inform him and the Government that I had been retained to represent Mr.

55

Alshdaifat on all matters that they had with him, and that all future communications should be with me or Mr. Alshdaifat's other counsel, Michael McCullough, Esq.")

Agent Ciranni, however, intentionally refused to contact Mr. Alshdaifat's attorneys.  Mr. Forrest, the attorney in Detroit, left voice messages with Agent Ciranni on June 8, June 14, and June 21, 2011 -- the last of these messages was only about three weeks prior to Mr. Alshdaifat's arrest. (Ex. D, Forrest Decl., ¶ 9.)  But Agent Ciranni never returned these calls. (*Id.* at ¶ 12.)  Also, Michael McCullough, Esq., Mr. Alshdaifat's New York attorney specializing in Customs matters, was very persistent in his efforts to contact the Agent.  He sent e-mails, left voice messages, called agents in New York and Washington, D.C., and even at one point, "actually reached Agent Ciranni by telephone, but [the Agent] refused to speak to him and hung up on [him]." (Ex. C, McCullough Decl., ¶ 11.)

Certainly, therefore, Agent Ciranni was on notice of Mr. Alshdaifat's very able representation.  The fact that the Agent repeatedly refused to speak to counsel also gives context to the day of Mr. Alshdaifat's arrest and custodial interrogation.  It simply does not make sense that Mr. Alshdaifat would go through all of the trouble and expense of hiring two very competent, aggressive, and experienced attorneys -- months before his arrest on related matters -- and then at the time when counsel is most needed, simply ignore them.  Mr. Alshdaifat explained in his attached declaration that this is not what he did.  He wanted to call his lawyers on the day of his arrest, but was refused permission by the arresting officers. (Ex. A, Alshdaifat Decl., 4/30/12, ¶¶ 15, 21.)

Thus, because Mr. Alshdaifat's right to counsel had attached on the day he was interrogated and he invoked that right to the arresting officers, any custodial statements made in the absence of counsel must be suppressed.

## VI.

### THE COURT SHOULD COMPEL THE GOVERNMENT TO PROVIDE EXPERT NOTICE AND NOTICE OF RULE 404(b) EVIDENCE "IN A TIMELY FASHION" BEFORE TRIAL

The government should be compelled to comply with its obligation pursuant to Rule 16(a)(1)(E) that it provide, "in a timely fashion," the identity of any expert the government intends to call at trial and a summary of the expert's opinions and qualifications. (See Gov. Discovery Letter, dated August 11, 2011, p. 5) (citing its expectation to call expert witnesses on the Customs entry process, smuggling techniques, Egyptian law, and radio-carbon testing of coffins). Some of these areas may be inappropriate for expert testimony, or simply irrelevant to the contested issues at trial. In any event, Mr. Alshdaifat seeks reasonable advance notice of the government's intended use of experts to make an appropriate and timely response.

Mr. Alshdaifat also renews his request for the government to provide reasonable notice prior to trial of its intention to introduce any evidence under Rule 404(b) of the Federal Rules of Evidence. This case involves international actors and events. Thus, it will require additional lead time to investigate and respond to any Rule 404(b) acts that the government might seek to introduce. Accordingly, we seek that the Court order the government to give notice of any Rule 404(b) evidence no later than 60 days prior to trial.

## VII.

### MOTION TO JOIN IN APPLICABLE MOTIONS MADE BY CO-DEFENDANT LEWIS

In the interest of judicial efficiency, Mr. Alshdaifat respectfully seeks leave of the Court to join in the motions of his co-defendant Joseph Lewis to the extent they also apply to him.

Specifically, the motions Mr. Alshdaifat seeks to join are:

57

(1)     Motion to dismiss indictment based on overall government misconduct, additional incidents of which are mentioned herein as directed at Mr. Alshdaifat, including but not limited to reckless allegations in search warrant affidavits, excessive execution of searches conducted of his personal e-mail and of his residence, including the wholesale seizure of his entire business inventory of ancient coins, and the refusal to recognize Mr. Alshdaifat's Fifth and Sixth Amendment rights to counsel;

(2)      Motion to dismiss Count 2, the money laundering conspiracy, as a matter of law; and

(3)     Motion to conduct an *in camera* inspection of the grand jury minutes.

## **CONCLUSION**

For all of the foregoing reasons, Mr. Alshdaifat respectfully moves the Court to grant his requested relief in its entirety.

Dated: New York, New York
      April 30, 2012

Respectfully submitted,

By: _____/S/_____
      Henry E. Mazurek
      Clayman & Rosenberg LLP
      305 Madison Avenue, Suite 1301
      New York, New York 10165
      Tel. (212) 922-1080
      mazurek@clayro.com
      *Attorneys for Defendant*
      *Salem Alshdaifat*